workers, including the plaintiffs, to levels materially below what would have prevailed in a competitive market.

2. Agri Stats, Inc., is a foreign corporation that actively and directly solicited, serviced and maintained business services and systemically and regularly conducts or conducted business and provided their services in this jurisdiction, including the regular visits by Agri Stats representatives to co-conspirator defendant processing plants of defendant processors in this jurisdiction, and these business activities directly relate to the damages to the plaintiffs alleged in this action. Agri Stats established substantial ongoing contractual relationships involving physical presence in Alabama and engaged in continuing business relationships with the co-conspirator defendant processors which employed the plaintiffs and they knew or should have known these direct contacts would impact plaintiffs and those similarly situated.

3. Perdue Farms, Inc. and Perdue Foods LLC (collectively "Perdue") are integrated poultry processors with headquarters in Salisbury, Maryland. Perdue operates, or during the relevant time period operated poultry facilities across the United States including in this jurisdiction. Perdue is, or was, a central and long-standing participant in the conspiracy with co-Defendants to depress and fix wages of Plaintiffs.

4. Tyson is among the world's largest processors of chicken, beef, and pork, with headquarters in Springdale, Arkansas. Tyson operates poultry facilities throughout the United States including in this jurisdiction during the relevant time period. Tyson is, or was, a central and long-standing participant in the conspiracy with co-defendants to depress and fix wages of Plaintiffs.

5. Pilgrim's Pride Corporation ("Pilgrim's") is a major poultry processor headquartered in Greeley, Colorado. Pilgrim's operates poultry facilities across the United States including in Alabama. Pilgrim's is, or was, a core member of the conspiracy, actively participating in the annual meetings and using exchanged data from co-conspirator Agri Stats as a direct mechanism for setting and suppressing employee wages.

6. Sanderson Farms, Inc. ("Sanderson") is a poultry processor headquartered in Laurel, Mississippi. Sanderson Farms is, or was, a central and long-standing

22

participant in the conspiracy with co-defendants to depress and fix wages of Plaintiffs.

7. Charoen Phopkhand Foods is a Thailand-based agro-industrial and food conglomerate and a co-conspirator with co-defendants to depress and fix wages of Plaintiffs. They operated poultry facilities across the United States including in this jurisdiction during the relevant time period. Additionally, in 2004, CP Foods sold its U.S. chicken-processing assets in Alabama. The integrated chicken business and substantial assets of Charoen Pokphand (USA) in Alabama were sold to Equity Group Eufaula Division, LLC.

8. Koch Foods, Inc. is a poultry processor headquartered in Park Ridge, Illinois. Koch operates poultry facilities across the United States including in this jurisdiction Koch Foods is one of the largest vertically integrated poultry processors in the United States and conducts substantial business nationwide, including through wholly owned and controlled operating subsidiaries in the State of Alabama. Koch is alleged to have been a consistent participant in the conspiracy with co-defendants to depress and fix wages of Plaintiffs.

9. Koch Foods of Alabama, LLC is an operating affiliate and agent of Koch Foods, Inc., who is a poultry processor operation in the United States and conducts substantial business nationwide, including through wholly owned and controlled operating subsidiaries in the State of Alabama, including this jurisdiction.

10. Peco Foods Inc. is an Alabama-based poultry processor headquartered in Tuscaloosa, Alabama. Peco Foods Inc. is, or was, a central and long-standing participant in the conspiracy with co-defendants to depress and fix wages of Plaintiffs.

11. Foster Poultry Farms, LLC poultry processor headquartered in Livingston, California. Foster Poultry Farms is, or was, a central and long-standing participant in the conspiracy with co-defendants to depress and fix wages of Plaintiffs.

12. Fictitious defendants A-G, whether singular or plural, is that person, firm, corporation or entity that was responsible for the defendants' payroll, human resources, accounting and decisions on the setting of employee wages and benefits.

23

13. Fictitious defendants H-N, whether singular or plural, is that person, firm, corporation or entity that managed, supervised and/or controlled the day-to-day business dealings of the defendant producers' facility at which the plaintiff(s) were employed during the time period relevant to the allegations in this action.

14. Fictitious defendants O-U, whether singular or plural, is that entity or those entities, that individual or those individuals, other than those described above, whose negligence, wantonness, intentional conduct, willfulness, fraud, conspiracy, complicity or other wrongful conduct contributed to the cause of the occurrence made the basis of Plaintiff's Complaint.

15. Fictitious defendants V-BB, whether singular or plural, are those entities which are the predecessors or successors-in-interest to any of those entities or individuals described above and herein.

16. The Individual HR and Plant Manager defendants are individuals whose identities are not yet fully known but who served as agents and employees of the defendant Processors. At all relevant times, these individuals acted within the line and scope of their employment. Their wrongful acts, including the direct exchange of competitively sensitive wage data with rival plants, were calculated to and did benefit their corporate employers by reducing labor costs. This conduct was known to, authorized by, and subsequently ratified by their respective employers.

17. All defendants, named and fictitious, participated in the same wage-fixing information exchange that directly suppressed wages paid to the plaintiffs causing damages.

18. All defendant producers, named and fictitious, subscribed to Agri Stats / WMS and attended meetings knowing Alabama plants and jobs were in the data set and that benchmark targets would be applied to Alabama wages causing damages to the plaintiffs and those similarly situated in this jurisdiction.

**A. The Poultry Processing Industry and its Susceptibility to Collusion**

1. The poultry processing industry possesses numerous structural characteristics, that make it uniquely susceptible to the type of long-running, collusive scheme alleged herein. These factors created an environment where the conspiracy could not only form but thrive for decades.

24

2. The defendant processors collectively control the majority of the U.S. poultry market. This high concentration limits the number of independent competitors, magnifies the conspirators' collective market power over labor, and simplifies the process of coordinating and policing a collusive agreement.

3. The cost of establishing a new, vertically integrated poultry processing complex, upon information and belief, exceeds $100 million. This immense capital requirement effectively prevents new competitors from entering the market to challenge the incumbents and disrupt their collusive arrangement.

4. Workers performing similar production and maintenance roles at different processing plants are largely interchangeable. This fungibility of labor makes it simple for competitors to compare and align compensation for any given position across the industry.

5. The workforce in poultry processing is disproportionately comprised of vulnerable populations, including marginalized citizens, immigrants, refugees, and asylum-seekers with limited English proficiency, education, and alternative employment options. This creates a captive labor pool that cannot easily respond to suppressed wages by seeking work elsewhere, allowing the defendants to depress compensation without fear of losing their workforce.

**B. The Decades-Long Conspiracy to Suppress Employee Compensation**

1. Upon information and belief, beginning as early as January 1, 2000, and continuing until at least July 20, 2021, the defendant Processors and their co-conspirators entered into a continuing contract, combination, and conspiracy to illegally fix, depress, maintain, and stabilize the compensation paid to their employees, including the plaintiffs, resulting in damage to plaintiffs.

2. The primary motivation for this conspiracy was to reduce labor costs—a substantial portion of each processor's operating expenses—and thereby maximize corporate profits at the direct expense of their employees. To facilitate this scheme, compensation decisions were centralized at the corporate headquarters of each defendant Processor rather than being made at the local plant level.

25

**C. The Mechanics of the Unlawful Conspiracy**

1. Defendant Producers did not passively receive WMS reports. Instead, competing processors formed a Poultry Industry Survey Group that collectively controlled the survey's scope, questions, participating companies, and the level of detail contained in results. A small Steering Committee of processor executives made the key decisions and met privately so that Defendants could speak candidly about compensation practices and align pay without oversight. WMS distributed survey results immediately before annual in-person compensation meetings, after which Defendants held private roundtables to coordinate how to apply the benchmarks to real-world pay decisions, including at Alabama plants.

2. The defendants executed their conspiracy through a sophisticated, multi-pronged strategy involving secretive in-person meetings, illicit information exchanges managed by third-party consultants, and direct communications between competitors.

3. A core component of the conspiracy was a series of annual in-person meetings of senior human resources and compensation executives from the competing defendant Processors.

4. These meetings were, upon information and belief, organized by a committee led by executives from defendants Tyson and Perdue, among others. Upon information and belief, these meetings were intentionally kept "off the books" to avoid creating a paper trail.

5. Upon information and belief these meetings, and the information shared, was/were to kept confidential.

6. During hours-long, private roundtable sessions executives from the defendants and others discussed survey results, agreed upon compensation rates for the coming year and chastised any processor that had deviated from previously fixed pay levels.

7. Webber, Meng, Sahl and Company, Inc. (WMS): WMS was hired to provide data to the producers under the guise of abiding by applicable regulations. WMS unwittingly provided the infrastructure for the conspiracy under a "veneer of legality." Its president, Jonathan Meng, repeatedly warned the defendant

26

Processors that their practice of exchanging future, disaggregated compensation data violated the applicable laws. Despite these warnings, WMS, at the direction of the processors, designed surveys to collect this data, resulting in sham anonymization, and its representatives were excluded from private "roundtable sessions" where illicit and conspiratorial agreements were being made.

8. The survey's framework was used as a pretext to hide Defendants' conspiracy from employees and the public. By routing their wage exchanges through WMS while dictating unlawful levels of detail and future-looking content, Defendants concealed material facts: that they were no longer competing for labor in Alabama and were instead jointly suppressing compensation. This concealment and coordinated conduct form part of the fraudulent scheme, civil conspiracy, and unjust enrichment described in this Complaint.

**2. Illicit Information Exchanges Facilitated by Agri Stats**

1. **Webber, Meng, Sahl & Co. (WMS)** was hired to administer an annual "Poultry Industry Compensation Survey," providing a veil of legality to the information exchange.

    a. The survey was designed by the processors' Steering Committee to collect detailed data on wages, salaries, and benefits. Crucially, against the repeated warnings of WMS President Jonathan Meng the survey collected future compensation data, including planned salary increases and their timing.
    b. Mr. Meng ultimately concluded that the processors hired WMS to "create an appearance of compliance" while they "continued to exchange disaggregated and deanonymized compensation data and continued to discuss and harmonize their compensation practices."

2. The survey employed an anonymization technique, replacing company names with letter codes. However, the reports contained such granular detail (e.g., plant locations, employee counts) that participants, Defendants, could easily identify their specific competitors. A former Perdue employee confirmed this, stating it was easy when "you're sitting in a meeting and the person across from you [from a competing processor] is reporting on what they do."

27

3. **Agri Stats, Inc.** provided the mechanism for continuous monitoring and enforcement of the conspiracy.

    a. Agri Stats collected and distributed monthly reports containing terabytes of detailed, current, non-public, and plant-specific compensation data from over 95% of U.S. poultry processors.

    b. Agri Stats collected non-public, confidential, and proprietary wage and compensation data from competing poultry processors and redistributed that data among the processors on a monthly basis, including current hourly wages and salaries broken down by plant and job position. This data was not publicly available and could only be accessed by processors that reciprocated by submitting their own detailed compensation information, thereby enabling coordinated wage decision-making among competitors.

    c. Agri Stats falsely represented that its compensation reports were anonymized or aggregated, while knowingly distributing highly granular, disaggregated data that processors could and did reverse-engineer to identify which competitors and which specific plants corresponded to particular wage figures. This sham anonymization concealed the true nature of the inter-company wage exchange while allowing processors to coordinate compensation with precision.

    d. Despite claims of anonymity, the data was easily decodable. A former Perdue employee stated the anonymity claim was "just bullshit" and that every participating processor "knew precisely which company reported which data."

    e. The monthly frequency of the reports allowed defendants to ensure no co-conspirator broke ranks by raising wages. A former Butterball executive confirmed there was "no question about it" that Agri Stats was used by processors to "monitor each other's performance." The crucial role of this data is underscored by the public statement of Joe Sanderson, then-CEO of Sanderson Farms, that "we live and die by Agri Stats."

    f. Agri Stats travelled between each Defendant Processor regularly and discussed the nonpublic, proprietary data at those meetings, including but not limited to quarterly in-person meetings with each processor's

28

executives, involving travel between producers and discussion of non-public data.

g. Agri Stats representatives physically visited each co-conspirator defendant processor plant, conducting on-site meetings lasting at least one week to establish data-collection processes, identify internal payroll data sources, and standardize reporting formats. These visits embedded Agri Stats directly inside processor operations and facilitated the ongoing exchange of sensitive wage information.

h. Agri Stats employees and representatives assisted poultry processors in interpreting and decoding Agri Stats reports, including by explaining how to determine which competitor submitted specific compensation data. Agri Stats personnel trained processor management on how to extract competitive intelligence from the reports, further enabling coordinated wage suppression.

i. Agri Stats audited the raw wage data submitted by processors to ensure accuracy and consistency, which ensured that no processor could deviate from agreed-upon compensation levels by secretly paying higher wages. These audits functioned as a policing and enforcement mechanism, reinforcing adherence to coordinated wage suppression.

j. Through the monthly dissemination of current wage data, Agri Stats enabled co-conspirator defendant processors to continuously monitor each other's compensation levels and detect deviations in near real time. This continuous monitoring reduced competitive uncertainty and stabilized wages across processors.

k. Agri Stats data was reviewed at individual poultry processing plants, not merely at corporate headquarters. Corporate officers and plant managers used Agri Stats benchmarks to compare plant wages against competitors and ensure that wages remained within coordinated ranges. Agri State corporate personnel were tasked with visiting plants to ensure wages stayed precisely aligned with Agri Stats benchmarks.

29

l. Agri Stats' reports were not sold to the public, employees, or unions. Agri Stats concealed the existence and mechanics of coordinated wage suppression from workers.

m. Because Agri Stats regularly travelled between processors, discussed proprietary wage data with each, and audited their submissions, it acted as a central hub connecting competing employers and transmitting information that allowed the conspiracy to function, persist, and remain concealed.

n. Each of the foregoing acts was intentional, knowing, and undertaken in furtherance of a common scheme to suppress and stabilize wages. Agri Stats knew that the compensation data it collected, analyzed, audited, and redistributed would be used by competing poultry processors to coordinate wage decisions, and Agri Stats substantially assisted that scheme through repeated, affirmative conduct resulting in harm to plaintiffs.

### 3. Direct Plant-to-Plant Communications

1. The conspiracy was furthered by frequent, direct communications between managers at competing plants. Plant managers and human resources personnel regularly contacted their counterparts at nearby rival facilities to request and exchange current and future wage and benefit information.

2. A former human resources manager who worked for both Perdue and George's admitted to this practice, stating, "We would collaborate. We would talk among each other to see what they were doing for pay."

### D. Fraudulent Concealment of the Conspiracy

1. The defendants took active and deliberate steps to fraudulently conceal their unlawful conduct from their employees and the public. These steps included:

    a. Holding secret, "off the books" meetings and requiring in-person attendance to avoid a paper trail.

    b. Using third-party consultants and sham data anonymization techniques to create a facade of legality for their illicit information exchanges.

30

    c.  Making false and misleading public statements on company websites and in advertisements claiming they paid "competitive wages," all while actively conspiring to suppress those same wages.

2. Following increased scrutiny, including the filing of a separate price-fixing lawsuit in 2016, several defendant Processors abruptly withdrew from the WMS survey, citing the "advice of legal counsel." This change in behavior is compelling evidence of the defendants' consciousness of guilt.

**E. Harm to the Plaintiffs**

1. The direct and intended result of the defendants' conspiracy was the artificial suppression of worker compensation. While worker productivity skyrocketed with processing line speeds increasing by **54%** between 1999 and 2015 the real-world earnings of those workers plummeted. During that same period, inflation-adjusted hourly wages for poultry processing workers *decreased* by more than **1%**.

2. The small annual raises that workers did receive were often entirely offset by corresponding increases in health insurance premiums. As a direct result of the conspiracy, the plaintiffs and other similarly situated workers were paid materially less than they would have been in a competitive market, which systematically transferred wealth from the plaintiffs and the class to the defendants in the form of artificially inflated corporate profits.

**F. Specific Allegations Against Each Defendant**

1. **The Perdue Defendants:** Perdue was a central and long-standing participant in the conspiracy. Its employees attended every annual compensation meeting between 2001 and 2019, submitted detailed compensation data to WMS every year from 2000 to 2019, and subscribed to Agri Stats. A former Perdue employee described the company's CEO as an "Agri Stats guru" and stated that Perdue managers regularly collaborated with rivals to exchange wage information.

2. Perdue employees knew that compensation data submitted through WMS was readily attributable to specific companies and plants, particularly during in-person meetings where competitors discussed their own reported data. A former Perdue employee explained that the source of compensation figures was obvious because

31

"you're sitting in a meeting and the person across from you is reporting on what they do."

3. Upon information and belief, Perdue used the Agri-Stats data to incorporate and monitor the conspiracy to suppress wages and ensure compliance by all defendants with the conspiracy.

4. Perdue subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors including co-conspirator defendants on a monthly basis.

5. Perdue regularly attended the annual meetings of co-conspirator defendants and obtained and exchanged competing processors information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels.

6. Perdue submitted data to the annual WMS survey during multiple years and subscribed to Agri Stats to exchange plant-specific compensation data on a monthly basis.

7. Perdue regularly exchanged current and future wages with managers from co-conspirator defendants and any planned future wage increases.

8. Perdue brought Agri Stats personnel into the company to train management on how to extract and interpret competitor-specific wage information from Agri Stats reports, despite the nominal claim that the data was anonymous.

9. Perdue employees reviewed disaggregated Agri Stats wage data during meetings held at Perdue poultry processing plants, using competitor comparisons to guide wage decisions at individual facilities rather than responding to local labor market forces.

10. Perdue and other co-conspirator defendants continued to reveal and discuss their specific compensation practices, future compensation plans, and target wage levels "behind closed doors", even after being warned that such conduct was inconsistent with lawful compensation benchmarking.

11. Perdue's knowing participation in repeated data exchanges, secret meetings, and direct communications predictably suppressed wages and benefits paid to poultry

32

processing workers, transferring economic value from workers to Perdue in the form of reduced labor costs and increased profits.

12. Each of the foregoing acts was intentional, knowing, and undertaken in concert with other co-conspirator defendants pursuant to a common plan to suppress employee compensation. Perdue knowingly joined and materially advanced a coordinated scheme that foreseeably caused economic harm to poultry workers, including Plaintiffs, and unjustly enriched Perdue at the expense of plaintiffs and those similarly situated.

13. **The Tyson Defendants:** Tyson was a leader of the conspiracy, serving on the Steering Committee that directed the WMS surveys. A Tyson Vice President of Compensation admitted in a 2015 email that "hourly production projected budgets" were "typically a discussion item" at the secret meetings. From 2013 to 2015, Tyson single-handedly paid WMS to conduct an even more granular survey to facilitate the exchange of raw, plant-level data, despite WMS's warnings that this violated the applicable law.

14. Tyson subscribed to Agri Stats and used it to exchange current, disaggregated, readily decodable, plant-specific compensation data with competing poultry processors on a monthly basis.

15. Tyson relied on Agri Stats reports to compare its wages to competitors and to keep its compensation within coordinated ranges rather than responding independently to labor market conditions.

16. Tyson employees and executives regularly attended secret, off-the-books Poultry Industry Compensation Committee meetings, including meetings held at the Hilton Sandestin Resort in Destin, Florida, where competing poultry processors exchanged non-public compensation information and discussed wages and benefits. These meetings were intentionally conducted outside normal reporting channels and without transparency to employees, and they facilitated coordinated wage decisions rather than independent competition.

17. Tyson was represented on the Steering Committee that controlled the structure, scope, and content of the WMS poultry compensation surveys for most of the relevant period. Through this role, Tyson participated in decisions to expand the surveys beyond generalized averages and to require more granular, plant-level,

33

and job-specific compensation information, increasing the usefulness of the surveys for coordinating wages rather than benchmarking competitively.

18. Tyson initiated, designed, and funded a supplemental compensation survey that collected raw, disaggregated, plant-level wage data for production, maintenance, and refrigeration workers. Tyson requested this survey despite warnings that its format violated accepted safeguards and facilitated identification of individual companies' and plants' wage data. Tyson paid for the survey, dictated its structure, and caused its results to be distributed to participating processors.

19. Tyson employees recruited other poultry processors to participate in the Tyson-sponsored survey and encouraged their submission of detailed wage data. Participants proceeded despite express warnings that the survey format defeated anonymity and allowed compensation data to be traced back to specific companies and plants.

20. Tyson regularly attended the annual meetings of co-conspirator defendants and obtained and exchanged competing processors information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels.

21. In advance of and for use at these secret compensation meetings, Tyson employees submitted highly detailed current and future compensation data to WMS, knowing and intending that the data would be distributed to, reviewed by, and discussed among competing poultry processors. Tyson made these submissions repeatedly over multiple years as part of the same coordinated scheme.

22. Tyson submitted data to the annual WMS survey during multiple years and subscribed to Agri Stats to exchange plant-specific compensation data on a monthly basis.

23. Tyson submitted highly detailed current compensation data to WMS in advance of meetings, knowing/expecting it would be distributed to and examined by competitors including co-conspirator defendants.

24. Tyson regularly exchanged current and future wages with managers from co-conspirator defendants and any planned future wage increases.

25. Tyson set compensation schedules and paid workers at "artificially depressed, wage fixed rates.

34

26. Tyson employees directly communicated with human-resources managers at competing poultry plants, including co-conspirator defendants to exchange current and future wage rates, including planned increases. These bilateral exchanges further reduced competition for labor and reinforced coordinated wage suppression.

27. As a result of this conduct, Tyson established compensation schedules and paid poultry workers' wages and benefits that were artificially suppressed and stabilized, rather than competitively determined. Tyson retained the financial benefit of reduced labor costs while workers bore the harm of depressed compensation resulting in damages to plaintiffs.

28. **Pilgrim's Pride Corporation:** Pilgrim's Pride was a core member of the conspiracy. A former employee stated that the company explicitly used Agri Stats data to set wages with the goal of paying "exactly in the middle" of the reported industry average. Its executives also requested that plant managers obtain current and future compensation information directly from competitors.

29. Pilgrim's subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

30. Pilgrim's regularly attended the annual meetings of co-conspirator defendants and obtained and exchanged competing processors information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels. In 2017, Pilgrim's withdrew from the annual meeting on the advice of counsel, demonstrating consciousness of its illegal conduct. However, they resumed participation in these meetings in 2018 and 2019.

31. Pilgrim's employees submitted detailed compensation data to WIMS for inclusion in the annual Poultry Industry Compensation Surveys. Pilgrim's knew and intended that this data, including current wages and planned future increases, would be distributed to and reviewed by competing processors during compensation meetings and related discussions.

32. Pilgrim's was among the co-conspirator defendants that controlled and influenced the design and operation of the WMS surveys, including decisions to collect granular, plant-level and job-specific compensation data. Pilgrim's participated in

35

surveys structured in a manner that allowed competitors, including co-conspirator defendants, to identify and compare each other's compensation practices.

33. Pilgrim's regularly exchanged current and future wages with managers from co-conspirator defendants and any planned future wage increases.

34. Pilgrim's used Agri Stats data at both corporate and plant levels, reviewing competitor compensation benchmarks to ensure that wages paid at individual Pilgrim's facilities remained aligned with industry benchmarks. Corporate personnel reviewed Agri Stats data with plant management to guide wage decisions.

35. In addition to survey-based exchanges, Pilgrim's Pride employees directly exchanged current and future wage information with employees of competing poultry processors. For example, Pilgrim's personnel exchanged wage information with Tyson employees regarding planned wage rates at specific plants, reducing uncertainty and reinforcing coordinated wage practices.

36. According to WMS President Jonathan Meng, Pilgrim's and other processors continued to discuss specific compensation practices, future wage plans, and target pay levels "behind closed doors", even after warnings that such exchanges were inconsistent with lawful benchmarking practices. Pilgrim's nevertheless continued participating in the surveys and meetings.

37. Pilgrim's established compensation schedules using survey results and Agri Stats benchmarks to align wages across its poultry processing facilities, rather than allowing wages to be determined by local labor supply and demand.

38. Through its participation in repeated data exchanges, secret meetings, and direct communications, Pilgrim's paid poultry processing workers, including the plaintiffs, wages and benefits that were suppressed and stabilized, transferring economic value from workers to Pilgrim's in the form of reduced labor costs.

39. Pilgrim's operated poultry processing facilities employing workers in Alabama and implemented compensation practices at those Alabama facilities that were informed by and aligned with the coordinated benchmarks and exchanges described above. These acts were directed at and caused harm to Alabama workers, including Plaintiffs.

36

40. Each of the foregoing acts was intentional, knowing, and undertaken in concert with others. Pilgrim's knowingly participated in a coordinated course of conduct that foreseeably suppressed employee compensation and unjustly enriched Pilgrim's at the expense of poultry processing workers, including Plaintiffs.

41. **Sanderson Farms, Inc.:** Sanderson subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

42. Sanderson employees submitted detailed compensation data to WMS for use in the annual Poultry Industry Compensation Survey, with the understanding that the data would be shared with and reviewed by competing processors at the compensation meetings including co-conspirator defendant processors. This included current wage information used to benchmark and align compensation across companies.

43. Sanderson Farms participated in surveys that were structured to allow competitors, including co-conspirator defendant processors, to identify the source of compensation data, including through granular plant-level details. Survey participants, including Sanderson Farms, reviewed compensation information in formats that allowed executives to match wage figures to specific competing companies and facilities including co-conspirator defendant processors.

44. Sanderson regularly attended the annual meetings of co-conspirator defendants and obtained and exchanged competing processors information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels.

45. Sanderson Farms was deeply integrated into the conspiracy, with its then-CEO publicly stating, "we live and die by Agri Stats." Like other conspirators, Sanderson Farms attended the secret annual meetings before withdrawing from the WMS survey group in 2012, informing other members that it was doing so "On the advice of legal counsel."

46. Following Sanderson Farms' merger with Wayne Farms, the resulting Wayne-Sanderson entity continued poultry processing operations using compensation structures informed by industry benchmarking practices, including Agri Stats data, thereby perpetuating the effects of the coordinated wage-setting scheme.

37

47. Through the foregoing conduct, Sanderson Farms paid poultry processing workers, including plaintiffs, wages that were suppressed and stabilized, transferring economic value from workers to Sanderson in the form of reduced labor costs and increased profitability.

48. Each of the foregoing acts was intentional, coordinated, and undertaken in concert with others. Sanderson Farms knowingly participated in a shared course of conduct that predictably suppressed employee compensation and unjustly benefited Sanderson at the expense of poultry processing workers, including Plaintiffs.

49. **The Koch Defendants:** (Koch Foods, Inc. & Koch Foods of Alabama, LLC) was a consistent participant, with its employees attending many of the annual compensation meetings. The company submitted data to the annual WMS survey during multiple years and subscribed to Agri Stats to exchange plant-specific compensation data on a monthly basis.

50. Koch subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

51. Koch relied on Agri Stats reports to compare its wages against competitors and to guide compensation decisions, rather than determining wages independently based on local labor conditions.

52. The Koch Defendants used Agri Stats wage benchmarks at both corporate and plant levels, reviewing competitor compensation data with plant management to ensure that wages at Koch facilities remained aligned with industry benchmarks. These practices replaced independent wage setting with coordinated benchmarking.

53. Koch regularly attended the annual meetings of co-conspirator defendants and obtained and exchanged competing processors information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels.

54. In addition to survey-based exchanges, the Koch Defendant employees directly exchanged current and future wage information with employees of competing poultry processors, including discussions of wage levels and timing of wage

increases. These communications reduced uncertainty and reinforced coordinated compensation practices.

55. Koch submitted data to the annual WMS survey during multiple years and subscribed to Agri Stats to exchange plant-specific compensation data on a monthly basis.

56. Through its participation in repeated data exchanges, secret meetings, and direct communications, Koch Foods paid poultry processing workers wages and benefits that were suppressed and stabilized, transferring economic value from workers to Koch in the form of reduced labor costs and increased profitability.

57. The Koch Defendants operated poultry processing facilities and related operations employing workers in Alabama and implemented compensation practices at those Alabama facilities that were informed by and aligned with the coordinated benchmarks and exchanges described above. These acts were directed at and caused harm to workers in this jurisdiction, including Plaintiffs.

58. Each of the foregoing acts was intentional, knowing, and undertaken in concert with others. The Koch Defendants knowingly joined and materially advanced a coordinated scheme that foreseeably suppressed employee compensation and unjustly enriched Koch at the expense of poultry processing workers, including Plaintiffs.

59. **Agri Stats, Inc.:** Agri Stats was the central monitoring and enforcement arm of the conspiracy as previously stated herein. It collected and distributed detailed, non-public, and readily decodable compensation data on a monthly basis. A former Perdue employee stated Agri Stats was responsible for "collusion in the poultry industry," and by admission of a former producer, confirmed that Agri Stats was used to monitor each other's performance. Agri Stats profited handsomely from its role, charging each processor substantial fees.

60. Agri Stats embedded itself within processor operations, repeatedly collected and audited non-public compensation data, traveled between competitors to discuss that data, trained processor personnel to interpret and apply competitor wage information, and redistributed detailed benchmarking reports that were used to guide actual wage decisions.

39

61. Agri Stats knew that its conduct would be used to align compensation practices rather than foster independent decision-making, and it continued that conduct despite the foreseeable and intended effect of depressing wages paid to poultry processing workers, including Plaintiffs. By doing so, Agri Stats materially advanced and concealed the conspiracy, causing direct harm to workers in this jurisdiction including the plaintiffs and unjustly enriching itself and the participating processors.

62. Agri Stats was not a passive service provider. It designed, executed, and enforced the information exchanges that allowed competing poultry processors to coordinate compensation practices while concealing that coordination from workers, including the plaintiffs. Through repeated affirmative acts, Agri Stats knowingly facilitated conduct that predictably suppressed wages and caused economic harm to Plaintiffs.

63. Through the foregoing acts, Agri Stats knowingly and substantially assisted in a coordinated scheme among competing poultry processors to suppress and stabilize employee compensation.

64. **Cargill Meat Solutions:** Cargill employees attended regular annual meetings, and every annual meeting between 2001 and 2019 where executives from competing poultry processors gathered to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of the plaintiffs and those similarly situated at artificially depressed levels.

65. Cargill submitted data to the annual WMS survey during multiple years and subscribed to Agri Stats to exchange plant-specific compensation data on a monthly basis.

66. Cargill exchanged current and future wages with managers of co-conspirator defendants and any planned future wage increases.

67. Cargill and other processors, including co-conspirator defendants, continued to reveal and discuss specific compensation practices, future wage plans, and target pay levels behind closed doors, even after being warned that such exchanges posed legal risks and were inconsistent with lawful benchmarking safeguards.

40

68. Through the foregoing conduct, Sanderson Farms paid poultry processing workers, including plaintiffs, wages that were suppressed and stabilized, transferring economic value from workers to Sanderson in the form of reduced labor costs and increased profitability.

69. Cargill operated poultry processing facilities and related operations employing workers in Alabama and implemented compensation practices at those Alabama facilities that were informed by and aligned with the coordinated benchmarks and exchanges described above. These acts were directed at and caused harm to Alabama workers, including Plaintiffs.

70. Each of the foregoing acts was intentional, knowing, and undertaken in concert with others. Cargill knowingly joined and materially advanced a coordinated scheme that foreseeably suppressed employee compensation and unjustly enriched Cargill at the expense of poultry processing workers, including Plaintiffs.

71. **Fictitious Defendants A-BB:** The individual John and Jane Doe defendants, including but not limited to HR and Plant Managers, successors, were the agents who carried out the conspiracy on the ground. Acting within the scope of their employment and at the direction of their corporate superiors, they engaged in regular bilateral exchanges of current and future wage information with managers at rival plants. These acts directly furthered the conspiracy and benefited their employers by ensuring local pay rates remained aligned and suppressed.

72. The foregoing factual allegations give rise to the following legal claims for relief.

## CAUSES OF ACTION
### COUNT I: FRAUD & FRAUDULENT CONCEALMENT (Against All defendants)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. Under Alabama law, a claim for fraudulent concealment is established by showing (1) a duty on the part of the defendant to disclose a material fact; (2) concealment or nondisclosure of that fact; (3) inducement of the plaintiff to act; and (4) action by the plaintiff to his or her injury. *Chiepalich v. Chiepalich*, 392 So. 3d 467 (Ala. 2023); APJI 16.05.

41