Wolters Kluwer

**CT Corporation**
**Service of Process Notification**
01/20/2026
CT Log Number 551151000

## Service of Process Transmittal Summary

**TO:**  Dana Sharitt
Wayne Farms LLC
4110 CONTINENTAL DR
OAKWOOD, GA 30566-2800

**RE:**  **Process Served in Alabama**

**FOR:**  Wayne Farms LLC  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Re: JAMES HERBERT AYERS; HENRY B. BAKER; GREGORY MAURICE BANDY; HENRY BASKIN; GERNARDO LAMAR BLAKELY; ELLA R BROWN; HENRY CHARLES BROWN, JR.; JASMINE JINAE BROWN; JASON LEE CHRISTIAN; FELICIA ANN COBB; GLORIA D. COWAN; JAWANNA QUINETTA CUNNINGHAM; GARRETT LAMAR DAVIS; JALAYDRIAN SHARAINE DELBRIDGE; IVAN VAIL-DELGADO; INNIS DUNCAN; JACQUELYNN DENISE EFFORD; ESSIE LEE ELLIS; HELEN ELLIS; ELIZABETH JENKINS FITZPATRICK; JEFFERY BERNARD FLINTROY; ETHEL BOWENS-FORD; GLORIA DEAN FOSTER; ELIZABETH GACHETTE // To: Wayne Farms LLC |
| **CASE #:** | 09CV202690000100 |
| **NATURE OF ACTION:** | Employee Litigation |
| **PROCESS SERVED ON:** | C T Corporation System, Montgomery, AL |
| **DATE/METHOD OF SERVICE:** | By Traceable Mail on 01/20/2026 |
| **JURISDICTION SERVED:** | Alabama |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  UPS Next Day Air |
| | Image SOP |
| | Email Notification,  Dana Sharitt  dana.sharitt@waynesanderson.com |
| | Email Notification,  Debbie Herring  debbie.herring@waynesanderson.com |
| | Email Notification,  Judith Carswell  judith.carswell@waynesanderson.com |
| | Email Notification,  Tracy Moss  tracy.moss@waynesanderson.com |
| | Email Notification,  Toni Bynum  toni.bynum@waynesanderson.com |
| | Email Notification,  Zachary Grant  zachary.grant@waynesanderson.com |
| | Email Notification,  Mason Wood  mason.wood@waynesanderson.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System<br>2 North Jackson Street<br>Suite 605<br>Montgomery, AL 36104<br>866-401-8252<br>LargeCorporationTeam@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the

EXHIBIT
2



**CT Corporation**
**Service of Process Notification**
01/20/2026
CT Log Number 551151000

included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.





Wayne Farms, LLC
c/o CT corporation System, Suite 605
2 N Jackson Street
Montgomery, AL 36104



CERTIFIED MAIL

9589 0710 5270 0072 2044 37

RASHAWN F. HARRIS
BULLOCK COUNTY CIRCUIT CLERK
P.O. BOX 230
UNION SPRINGS, AL 36089



AlaFile E-Notice

09-CV-2026-900001.00

To: WAYNE FARMS, LLC
C/O CT CORPORATION SYSTEM
2 N JACKSON STREET, SUITE 605
MONTGOMERY, AL, 36104

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

JAMES HERBERT AYERS ET AL V. AGRI STATS, INC. ET AL
09-CV-2026-900001.00

The following complaint was FILED on 1/7/2026 7:57:59 AM

Notice Date:    1/7/2026 7:57:59 AM

RASHAWN HARRIS
CIRCUIT COURT CLERK
BULLOCK COUNTY, ALABAMA
P.O. BOX 230
UNION SPRINGS, AL, 36089

334-738-2280

| State of Alabama<br>Unified Judicial System<br>Form C-34  Rev. 4/2024 | **SUMMONS**<br>**- CIVIL -** | **Court Case Number**<br>09-CV-2026-900001.00 |
|---|---|---|

**IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA**
**JAMES HERBERT AYERS ET AL V. AGRI STATS, INC. ET AL**

**NOTICE TO:** WAYNE FARMS, LLC, C/O CT CORPORATION SYSTEM 2 N JACKSON STREET, SUITE 605, MONTGOMERY, AL 36104

*(Name and Address of Defendant)*

THE COMPLAINT OR OTHER DOCUMENT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT, AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT OR OTHER DOCUMENT, WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE PLAINTIFF(S) OR ATTORNEY(S) OF THE PLAINTIFF(S),
Carolyn Elizabeth Littell

*[Name(s) of Attorney(s)]*

WHOSE ADDRESS(ES) IS/ARE: PO Box 350, Union Springs, AL 36089

*[Address(es) of Plaintiff(s) or Attorney(s)]*

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT OR OTHER DOCUMENT WERE SERVED ON YOU OR A JUDGMENT BY DEFAULT MAY BE RENDERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT OR OTHER DOCUMENT.

**TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY THE ALABAMA RULES OF CIVIL PROCEDURE TO SERVE PROCESS:**

☐ You are hereby commanded to serve this Summons and a copy of the Complaint or other document in this action upon the above-named Defendant.

☑ Service by certified mail of this Summons is initiated upon the written request below of pursuant to the Alabama Rules of the Civil Procedure.    JAMES HERBERT AYERS
*[Name(s)]*

01/07/2026    /s/ RASHAWN HARRIS    By: _____
*(Date)*    *(Signature of Clerk)*    *(Name)*

☑ Certified Mail is hereby requested.    /s/ Carolyn Elizabeth Littell
*(Plaintiff's/Attorney's Signature)*

**RETURN ON SERVICE**

*Certified Mail*
☐ Return receipt of certified mail received in this office on _____ .
*(Date)*

*Personal/Authorized*
☐ I certify that I personally delivered a copy of this Summons and the Complaint or other document to
_____ in _____ County, Alabama on _____ .
*(First and Last Name of Person Served)*    *(Name of County)*    *(Date)*

Document left:
☐ with above-named Defendant;
☐ with an individual authorized to receive service of process pursuant to Rule 4(c), Alabama Rules of Civil Procedure;
☐ at the above-named Defendant's dwelling house or place or usual place of abode with some person of suitable age and discretion then residing therein.

*Return of Non-Service*
☐ I certify that service of process of this Summons and the Complaint or other document was returned- Not Found
☐ I certify that service of process of this Summons and the Complaint or other document was refused by
_____ in _____ County, Alabama on _____ who is:
*(First and Last Name of Person Served)*    *(Name of County)*    *(Date)*
☐ the above-named Defendant;
☐ an individual authorized to receive service of process pursuant to Rule 4(c), Alabama Rules of Civil Procedure;

☐ As a designated process server pursuant to Rule 4(i)(1)(B), Alabama Rules of Civil Procedure, I certify that I am at least 19 years of age, I am not a party to this proceeding, and I am not related within the third degree by blood or marriage to the party seeking service of process.

*(Type of Process Server)*    *(Server's Signature)*    *(Address of Server)*

*(Badge or Precinct Number of Sheriff or Constable)*    *(Server's Printed Name)*

*(Badge or Precinct Number of Sheriff or Constable)*    *(Telephone Number of Designated Process Server)*

DOCUMENT 9

ELECTRONICALLY FILED
1/7/2026 7:57 AM
09-CV-2026-900001.00
CIRCUIT COURT OF
BULLOCK COUNTY, ALABAMA
RASHAWN HARRIS, CLERK

| State of Alabama<br>Unified Judicial System<br><br>Form ARCiv-93   Rev. 9/25 | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Case<br>09<br><br>Date of Filing:          Judge Code:<br>01/07/2026 |

## GENERAL INFORMATION

**IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA**
**JAMES HERBERT AYERS ET AL v. AGRI STATS, INC. ET AL**

**First Plaintiff:** ☐ Business  ☑ Individual  **First Defendant:** ☑ Business  ☐ Individual
☐ Government  ☐ Other                     ☐ Government  ☐ Other

**NATURE OF SUIT:** Select primary cause of action, by checking box (check only one) that best characterizes your action:

**TORTS: PERSONAL INJURY**
☐ WDEA - Wrongful Death
☐ TONG - Negligence: General
☐ TOMV - Negligence: Motor Vehicle
☐ TOWA - Wantonness
☐ TOPL - Product Liability/AEMLD
☐ TOMM - Malpractice-Medical
☐ TOLM - Malpractice-Legal
☐ TOOM - Malpractice-Other
☑ TBFM - Fraud/Bad Faith/Misrepresentation
☐ TOXX - Other: _____

**TORTS: PERSONAL INJURY**
☐ TOPE - Personal Property
☐ TORE - Real Property

**OTHER CIVIL FILINGS**
☐ ABAN - Abandoned Automobile
☐ ACCT - Account & Nonmortgage
☐ APAA - Administrative Agency Appeal
☐ ADPA - Administrative Procedure Act
☐ ANPS - Adults in Need of Protective Service

**OTHER CIVIL FILINGS (cont'd)**
☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture Appeal/
         Enforcement of Agency Subpoena/Petition to Preserve
☐ CVRT - Civil Rights
☐ COND - Condemnation/Eminent Domain/Right-of-Way
☐ CTMP - Contempt of Court
☐ CONT - Contract/Ejectment/Writ of Seizure
☐ TOCN - Conversion
☐ EQND - Equity Non-Damages Actions/Declaratory Judgment/
         Injunction Election Contest/Quiet Title/Sale For Division
☐ CVUD - Eviction Appeal/Unlawful Detainer
☐ FORJ - Foreign Judgment
☐ FORF - Fruits of Crime Forfeiture
☐ MSHC - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
☐ PFAB - Protection From Abuse
☐ EPFA - Elder Protection From Abuse
☐ QTLB - Quiet Title Land Bank
☐ FELA - Railroad/Seaman (FELA)
☐ RPRO - Real Property
☐ WTEG - Will/Trust/Estate/Guardianship/Conservatorship
☐ COMP - Workers' Compensation
☐ CVXX - Miscellaneous Circuit Civil Case

**ORIGIN:**  F ☑ INITIAL FILING       P ☐ APPEAL FROM PROBATE
                                              COURT

           A ☐ APPEAL FROM          O ☐ OTHER
               DISTRICT COURT

**HAS JURY TRIAL BEEN DEMANDED?**  ☑ YES  ☐ NO    Note:  Checking "Yes" does not constitute a demand for a
                                                    jury trial. (See Rules 38 and 39, Ala.R.Civ.P, for procedure)

**RELIEF REQUESTED:**  ☑ MONETARY AWARD REQUESTED  ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:**
LIT028                   1/7/2026 7:57:57 AM              /s/ Carolyn Elizabeth Littell
_____         _____          _____
                        Date                          Signature of Attorney/Party filing this form

**MEDIATION REQUESTED:**  ☐ YES ☑ NO  ☐ UNDECIDED

**Election to Proceed under the Alabama Rules for Expedited Civil Actions:**  ☐ YES ☑ NO

ELECTRONICALLY FILED
1/7/2026 7:57 AM
09-CV-2026-900001.00
CIRCUIT COURT OF
BULLOCK COUNTY, ALABAMA
RASHAWN HARRIS, CLERK

# IN THE CIRCUIT COURT OF
# BULLOCK COUNTY, ALABAMA

JAMES HERBERT AYERS;
HENRY B. BAKER;
GREGORY MAURICE BANDY;
HENRY BASKIN;
GERNARDO LAMAR BLAKELY;
ELLA R BROWN;
HENRY CHARLES BROWN, JR.;
JASMINE JINAE BROWN;
JASON LEE CHRISTIAN;
FELICIA ANN COBB;
GLORIA D. COWAN;
JAWANNA QUINETTA CUNNINGHAM;
GARRETT LAMAR DAVIS;
JALAYDRIAN SHARAINE DELBRIDGE;
IVAN VAIL-DELGADO;
INNIS DUNCAN;
JACQUELYNN DENISE EFFORD;
ESSIE LEE ELLIS;
HELEN ELLIS
ELIZABETH JENKINS FITZPATRICK;
JEFFERY BERNARD FLINTROY
ETHEL BOWENS-FORD;
GLORIA DEAN FOSTER;
ELIZABETH GACHETTE;
ERIC A. HARRIS;
JAMES EARL HARRIS;
ERIC CENTER HENDERSON;
JACQUELINE DENISE HENDERSON;
EUNICE ELAINE BROWN HOOKS;
JEMMIE EARL HICKS, JR.;
ESSIE M. HILL;
FREDRICK JEROME HIX;
JEREMIAH CORNELIUS HOYLE;
ESTELLA S. HURT;
IDA M. HURT;
ENESTO LERNARD IVORY;

1

FELICIA MICHELLE JACKSON;
FRANCES ROSE JOHNSON;
JENIFFER R. KEY;
FREEMAN KENT KING;
GLORY KING;
EUGENE DEWAYNE LARKINS;
FREDRICK LAMAR LAWRENCE;
FANNIE BELL LOCKWOOD;
HANSON WEST MACK;
JADARRIAN DIONTA MACK;
ERIC ANTONIO MACON;
ERICA SHUNTALL MAHONE;
HELEN LOUISE MASON;
GLORIA D. MIDDLETON;
ELLA M. MILBRY;
ELVIS GREGORY MILES;
ESSER L. MILES;
JAMAR D. MORRIS;
JEFFERY TERRELL MURRAY;
ERIC L. O'NEAL;
ERICA L. O'NEAL;
ELVIN LEIGH O'NEAL;
HARVEY CORNELIUS PARKER;
JACQUELINE W PATTERSON;
EDRICK DEAUNDREA PEARSON;
IRVIN JEROME PUGH;
JAMES BILLY RAYBON;
JEMARIO DENZELL EDWARD RAYBON;
JELISSA MONTREAL ROBINSON;
ESTELLA ROSS;
FRAZIER LEE SCOTT, JR.;
GAZETTE JACKSON SCOTT;
HAROLD BERNARD SCOTT, JR.;
JEFFERY BRUCE SCOTT, JR.;
JEFFREY BRUCE SCOTT, SR.;
JAMES HERRON SHELL, JR.;
FREDDIE LEE SHELLEY;
JEFFERY LAMAR SIMMONS;
JARVIS SMART;
GLORIA BELL SMITH;

2

JANEKIA QUANTRAIL SMITH;
FORICESTEEN STREETER;
GEORGE WILLIS SURLES;
ETHEL JANE TARVER;
HUBBARD A. TARVER;
JACQUELINE SARMANE THOMPKINS;
EMILY ESTHER THOMPSON;
JAMILA SASHUN TOWNSEND;
HYTASHA TRABUE;
JA'JUANTAE MALIK TRABUE;
ELIJAH MARQUZ WALKER;
FARENZO WEATHINGTON;
JERALDINE R. WEAVER;
ERIC LAMAR WITHERSPOON,
    *Plaintiffs,*

    v.                                          CIVIL ACTION NO. CV-

AGRI STATS, INC.;                               COMPLAINT
PERDUE FARMS, INC.;
PERDUE FOODS, LLC;                              Jury Trial Demand
TYSON FOODS, INC., is successor to
KEYSTONE FOODS, LLC; EQUITY GROUP,
and CHAROEN PHOPKHAND;
PILGRIM'S PRIDE CORPORATION;
WAYNE FARMS, LLC;
WAYNE-SANDERSON FARMS, LLC, the
successor entity resulting from the merger of
Sanderson Farms, Inc. and Wayne Farms, LLC;
CARGILL MEAT SOLUTIONS, INC.;
CONTINENTAL GRAIN COMPANY;
KOCH FOODS, INC.;
KOCH FOODS OF ALABAMA, LLC;
PECO FOODS, INC.;
FOSTER POULTRY FARMS, LLC;
Fictitious Defendant A-BB,
    *Defendants.*

3

## COMPLAINT

**COME NOW** the plaintiffs in the above styled cause and bring this action against the defendants, named and fictitious as says unto the Court as follows:

### INTRODUCTION

1. This action is brought to remedy a secret, multi-decade conspiracy orchestrated by America's largest poultry processing companies. While holding themselves out to the public as fierce competitors, these corporate giants privately colluded to systematically fix, depress, and stabilize the compensation paid to hundreds of thousands of their most vulnerable employees.

2. Through "off the books" meetings, illicit exchanges of competitively sensitive data facilitated by consulting firms, and direct plant-to-plant communications, the defendants formed an unlawful cartel to suppress labor costs and maximize their own profits. This conduct, which resulted in artificially depressed wages and benefits for the plaintiffs and other workers, constitutes a flagrant and ongoing violation of the laws of the State of Alabama.

### JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over the claims asserted herein pursuant to the laws and Constitution of the State of Alabama.

2. Venue is proper in Bullock County, Alabama, pursuant to as one or more of the defendants transact or during the relevant time period transacted business within this jurisdiction, regularly, systemically and actively, and the wrongful acts and omissions alleged herein occurred in or had substantial effects within this county, including the plaintiffs.

3. The amount in controversy for each individual plaintiff is no more than $74,999.99 per Plaintiff.

### PARTIES

**Plaintiffs**

1. Plaintiff, JAMES HERBERT AYERS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants'

4

unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

2. Plaintiff, HENRY B. BAKER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

3. Plaintiff, GREGORY MARUICE BANDY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

4. Plaintiff, HENRY BASKIN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

5. Plaintiff, GERNARDO LAMAR BLAKELY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

6. Plaintiff, ELLA R. BROWN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

7. Plaintiff, HENRY CHARLES BROWN, JR., is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

5

8. Plaintiff, JASMINE JINAE BROWN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

9. Plaintiff, JASON LEE CHRISTIAN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

10. Plaintiff, FELICIA ANN COBB, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

11. Plaintiff, GLORIA D. COWAN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

12. Plaintiff, JAWANNA QUINETTA CUNNINGHAM, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

13. Plaintiff, GARRETT LAMAR DAVIS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

14. Plaintiff, JALAYDRIAN SHARAINE DELBRIDGE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or

6

more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

15. Plaintiff, IVAN VAIL-DELGADO, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

16. Plaintiff, INNIS DUNCAN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

17. Plaintiff, JACQUELYNN DENISE EFFORD, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

18. Plaintiff, ESSIE LEE ELLIS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

19. Plaintiff, HELEN ELLIS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

20. Plaintiff, ELIZABETH JENKINS FITZPATRICK, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the

7

defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

21. Plaintiff, JEFFERY BERNARD FLINTROY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

22. Plaintiff, ETHEL BOWENS-FORD, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

23. Plaintiff, GLORIA DEAN FOSTER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

24. Plaintiff, ELIZABETH GACHETTE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

25. Plaintiff, ERIC A. HARRIS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

26. Plaintiff, JAMES EARL HARRIS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

8

27. Plaintiff, ERIC CENTER HENDERSON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

28. Plaintiff, JACQUELINE DENISE HENDERSON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

29. Plaintiff, EUNICE ELAINE BROWN HOOKS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

30. Plaintiff, JEMMIE EARL HICKS, JR., is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

31. Plaintiff, ESSIE M. HILL, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

32. Plaintiff, FREDRICK JEROME HIX, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

33. Plaintiff, JEREMIAH CORNELIUS HOYLE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of

9

the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

34. Plaintiff, ESTELLE S. HURT, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

35. Plaintiff, IDA M. HURT, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

36. Plaintiff, ENESTO LERNARD IVORY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

37. Plaintiff, FELICIA MICHELLE JACKSON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

38. Plaintiff, FRANCES ROSE JOHNSON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

39. Plaintiff, JENIFFER R. KEY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful

10

conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

40. Plaintiff, FREEMAN KENT KING, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

41. Plaintiff, GLORIA KING, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

42. Plaintiff, EUGENE DEWAYNE LARKINS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

43. Plaintiff, FREDRICK LAMAR LAWRENCE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

44. Plaintiff, FANNIE BELL LOCKWOOD, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

45. Plaintiff, HANSON WEST MACK, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

11

46. Plaintiff, JADARRIAN DIONTA MACK, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

47. Plaintiff, ERIC ANTONIO MACON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

48. Plaintiff, ERICA SHUNTALL MAHONE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

49. Plaintiff, HELEN LOUISE MASON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

50. Plaintiff, GLORIA D. MIDDLETON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

51. Plaintiff, ELLA M. MILBRY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

52. Plaintiff, ELVIS GREGORY MILES, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of

12

the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

53. Plaintiff, ESSER L. MILES, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

54. Plaintiff, JAMAR D. MORRIS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

55. Plaintiff, JEFFERY TERRELL MURRAY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

56. Plaintiff, ERIC L. O'NEAL, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

57. Plaintiff, ERICA L. O'NEAL, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

58. Plaintiff, ELVIN LEIGH O'NEAL, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful

conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

59. Plaintiff, HARVEY CORNELIUS PARKER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

60. Plaintiff, JACQUELINE W. PATTERSON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

61. Plaintiff, EDRICK DEAUNDREA PEARSON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

62. Plaintiff, IRVIN JEROME PUGH, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

63. Plaintiff, JAMES BILLY RAYBON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

64. Plaintiff, JEMARIO DENZELL EDWARD RAYBON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

14

65. Plaintiff, JELISSA MONTREAL ROBINSON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

66. Plaintiff, ESTELLA ROSS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

67. Plaintiff, FRAZIER LEE SCOTT, JR., is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

68. Plaintiff, GAZETTE JACKSON SCOTT, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

69. Plaintiff, HAROLD BERNARD SCOTT, JR., is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

70. Plaintiff, JEFFERY BRUCE SCOTT, JR., is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

71. Plaintiff, JEFFERY BRUCE SCOTT, SR., is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of

the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

72. Plaintiff, JAMES HERRON SHELL, JR., is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

73. Plaintiff, FREDDIE LEE SHELLEY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

74. Plaintiff, JEFFERY LAMAR SIMMONS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

75. Plaintiff, JARVIS SMART, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

76. Plaintiff, GLORIA BELL SMITH, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

77. Plaintiff, JANEKIA QUANTRAIL SMITH, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants'

16

unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

78. Plaintiff, FORICESTEEN STREETER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

79. Plaintiff, GEORGE WILLIS SURLES, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

80. Plaintiff, ETHEL JANE TARVER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

81. Plaintiff, HUBBARD A. TARVER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

82. Plaintiff, JACQUELINE SARMANE THOMPKINS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

83. Plaintiff, EMILY ESTHER THOMPSON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

84. Plaintiff, JAMILA SASHUN TOWNSEND, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

85. Plaintiff, HYTASHA TRABUE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

86. Plaintiff, JA'JUANTAE MALIK TRABUE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

87. Plaintiff, ELIJAH MARQUZ WALKER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

88. Plaintiff, FARENZO WEATHINGTON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

89. Plaintiff, JERALDINE R. WEAVER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

90. Plaintiff, ERIC LAMAR WITHERSPOON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of

the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

**Defendants**

1. Agri Stats, Inc., is a foreign corporation that actively solicited, serviced and maintained business services and systemically and regularly conducts or conducted business in this jurisdiction, and these business activities directly relate to the damages to the plaintiffs alleged in this action. They actively solicited and maintained business relationships with Alabama-based companies, including co-conspirator defendants. They regularly visited the plants of the co-conspirator defendants in this jurisdiction and in Alabama. Agri Stats purposefully availed itself of the benefits and protections of the Alabama market. This was not passive conduct, but rather an active and continuous service provision involving data collection, auditing, and report dissemination to specific clients in the state and direct, physical presence through representatives in this jurisdiction. The harm to the Plaintiffs, receiving artificially depressed wages as a result of Agri Stats' services, contacts and participation in the conspiracy, occurred in Alabama and was directly related to Agri Stats' business activities within the state. Agri Stats provided a service that it knew or should have known directly and negatively impacted the compensation of a large workforce within this jurisdiction.

2. Perdue Farms, Inc., Perdue Foods, LLC, (hereinafter collectively referred to as "Perdue" unless otherwise specified") is a foreign corporation that conducts or conducted business in this jurisdiction, purposefully availed itself to the laws, rights and protections of this jurisdiction, contacts within relate to the plaintiffs' claims, their contacts are such as Defendant should reasonably anticipate being subject to this court's jurisdiction.

3. Keystone Foods, LLC, Equity Group, Charoen Phopkhand Foods all K/N/A Tyson Foods, Inc. (collectively referred to herein as "Tyson" unless otherwise specified) is a foreign corporation that conducts or conducted business in this jurisdiction during the relevant time period, purposefully availed itself to the laws, rights and protections of this jurisdiction, contacts within relate to the plaintiffs' claims, their contacts are such as defendant should reasonably anticipate being subject to this court's jurisdiction.

19

4. Pilgrim's Pride Corporation, is a foreign corporation that conducts or conducted business in this jurisdiction, purposefully availed itself to the laws, rights and protections of this jurisdiction, contacts within relate to the plaintiffs' claims, their contacts are such as Defendant should reasonably anticipate being subject to this court's jurisdiction.

5. Wayne Farms LLC, Wayne-Sanderson Farms LLC, Sanderson Farms, Inc., (hereinafter collectively referred to as "Sanderson" unless otherwise specified) is a foreign corporation that conducts or conducted business in this jurisdiction, purposefully availed itself to the laws, rights and protections of this jurisdiction, contacts within relate to the plaintiffs' claims, their contacts are such as Defendant should reasonably anticipate being subject to this court's jurisdiction.

6. Cargill Meat Solutions Corporation and Continental Grain Company are foreign corporations that jointly entered into a venture to operate Wayne-Sanderson Farms LLC. Wayne-Sanderson Farms LLC is a foreign limited liability company formed through the merger of Sanderson Farms, Inc. and Wayne Farms LLC. Each of these entities conducts or conducted business in this jurisdiction, has purposefully availed itself of the laws, rights, and protections of the State of Alabama, and has maintained contacts within this forum that directly relate to the Plaintiffs' claims. Their business activities in Alabama are such that they should reasonably anticipate being subject to the jurisdiction of this Court.

7. Koch Foods, Inc., is a foreign corporation that conducts or conducted business in this jurisdiction, purposefully availed itself to the laws, rights and protections of this jurisdiction, and their contacts within this jurisdiction relate to the plaintiffs' claims, their contacts are such as Defendant should reasonably anticipate being subject to this court's jurisdiction.

8. Koch Foods of Alabama, LLC is a limited liability company that conducts or conducted business in this jurisdiction as an operating affiliate and agent of Koch Foods, Inc., (collectively referred to herein as "Koch" unless otherwise specified) purposefully availed itself to the laws, rights and protections of this jurisdiction, and their contacts within this jurisdiction relate to the plaintiffs' claims, their contacts are such as Defendant should reasonably anticipate being subject to this court's jurisdiction.

20

9. Peco Foods, Inc., is a privately held Alabama corporation that conducts or conducted business in Alabama, purposefully availed itself to the laws, rights and protections of this jurisdiction, and their contacts within this jurisdiction relate to the plaintiffs' claims, their contacts are such as Defendant should reasonably anticipate being subject to this court's jurisdiction.

10. Foster Poultry Farms, LLC is a foreign limited liability company that conducts or conducted business in this jurisdiction during the relevant time period, purposefully availed itself to the laws, rights and protections of this jurisdiction, and their contacts within this jurisdiction relate to the plaintiffs' claims, their contacts are such as Defendant should reasonably anticipate being subject to this court's jurisdiction.

11. Fictitious defendants A-G, whether singular or plural, is that person, firm, corporation or entity that was responsible for the defendants' payroll, human resources, accounting and decisions on the setting of employee wages and benefits.

12. Fictitious defendants H-N, whether singular or plural, is that person, firm, corporation or entity that managed, supervised and/or controlled the day-to-day business dealings of the defendant producers' facility at which the plaintiff(s) were employed during the time period relevant to the allegations in this action.

13. Fictitious defendants O-U, whether singular or plural, is that entity or those entities, that individual or those individuals, other than those described above, whose negligence, wantonness, intentional conduct, willfulness, fraud, conspiracy, complicity or other wrongful conduct contributed to the cause of the occurrence made the basis of Plaintiffs' Complaint.

14. Fictitious defendants V-BB, whether singular or plural, are those entities which are the predecessors or successors-in-interest to any of those entities or individuals described above and herein.

## FACTUAL ALLEGATIONS

1. Defendants, named and fictitious, participated in a multi-decade conspiracy among the nation's dominant poultry processors including the defendant processors. The purpose of this conspiracy was to eliminate competition for labor by artificially suppressing the compensation of hundreds of thousands of poultry

21

workers, including the plaintiffs, to levels materially below what would have prevailed in a competitive market.

2. Agri Stats, Inc., is a foreign corporation that actively and directly solicited, serviced and maintained business services and systemically and regularly conducts or conducted business and provided their services in this jurisdiction, including the regular visits by Agri Stats representatives to co-conspirator defendant processing plants of defendant processors in this jurisdiction, and these business activities directly relate to the damages to the plaintiffs alleged in this action. Agri Stats established substantial ongoing contractual relationships involving physical presence in Alabama and engaged in continuing business relationships with the co-conspirator defendant processors which employed the plaintiffs and they knew or should have known these direct contacts would impact plaintiffs and those similarly situated.

3. Perdue Farms, Inc. and Perdue Foods LLC (collectively "Perdue") are integrated poultry processors with headquarters in Salisbury, Maryland. Perdue operates, or during the relevant time period operated poultry facilities across the United States including in this jurisdiction. Perdue is, or was, a central and long-standing participant in the conspiracy with co-Defendants to depress and fix wages of Plaintiffs.

4. Tyson is among the world's largest processors of chicken, beef, and pork, with headquarters in Springdale, Arkansas. Tyson operates poultry facilities throughout the United States including in this jurisdiction during the relevant time period. Tyson is, or was, a central and long-standing participant in the conspiracy with co-defendants to depress and fix wages of Plaintiffs.

5. Pilgrim's Pride Corporation ("Pilgrim's") is a major poultry processor headquartered in Greeley, Colorado. Pilgrim's operates poultry facilities across the United States including in Alabama. Pilgrim's is, or was, a core member of the conspiracy, actively participating in the annual meetings and using exchanged data from co-conspirator Agri Stats as a direct mechanism for setting and suppressing employee wages.

6. Sanderson Farms, Inc. ("Sanderson") is a poultry processor headquartered in Laurel, Mississippi. Sanderson Farms is, or was, a central and long-standing

22

participant in the conspiracy with co-defendants to depress and fix wages of Plaintiffs.

7. Charoen Phopkhand Foods is a Thailand-based agro-industrial and food conglomerate and a co-conspirator with co-defendants to depress and fix wages of Plaintiffs. They operated poultry facilities across the United States including in this jurisdiction during the relevant time period. Additionally, in 2004, CP Foods sold its U.S. chicken-processing assets in Alabama. The integrated chicken business and substantial assets of Charoen Pokphand (USA) in Alabama were sold to Equity Group Eufaula Division, LLC.

8. Koch Foods, Inc. is a poultry processor headquartered in Park Ridge, Illinois. Koch operates poultry facilities across the United States including in this jurisdiction Koch Foods is one of the largest vertically integrated poultry processors in the United States and conducts substantial business nationwide, including through wholly owned and controlled operating subsidiaries in the State of Alabama. Koch is alleged to have been a consistent participant in the conspiracy with co-defendants to depress and fix wages of Plaintiffs.

9. Koch Foods of Alabama, LLC is an operating affiliate and agent of Koch Foods, Inc., who is a poultry processor operation in the United States and conducts substantial business nationwide, including through wholly owned and controlled operating subsidiaries in the State of Alabama, including this jurisdiction.

10. Peco Foods Inc. is an Alabama-based poultry processor headquartered in Tuscaloosa, Alabama. Peco Foods Inc. is, or was, a central and long-standing participant in the conspiracy with co-defendants to depress and fix wages of Plaintiffs.

11. Foster Poultry Farms, LLC poultry processor headquartered in Livingston, California. Foster Poultry Farms is, or was, a central and long-standing participant in the conspiracy with co-defendants to depress and fix wages of Plaintiffs.

12. Fictitious defendants A-G, whether singular or plural, is that person, firm, corporation or entity that was responsible for the defendants' payroll, human resources, accounting and decisions on the setting of employee wages and benefits.

13. Fictitious defendants H-N, whether singular or plural, is that person, firm, corporation or entity that managed, supervised and/or controlled the day-to-day business dealings of the defendant producers' facility at which the plaintiff(s) were employed during the time period relevant to the allegations in this action.

14. Fictitious defendants O-U, whether singular or plural, is that entity or those entities, that individual or those individuals, other than those described above, whose negligence, wantonness, intentional conduct, willfulness, fraud, conspiracy, complicity or other wrongful conduct contributed to the cause of the occurrence made the basis of Plaintiff's Complaint.

15. Fictitious defendants V-BB, whether singular or plural, are those entities which are the predecessors or successors-in-interest to any of those entities or individuals described above and herein.

16. The Individual HR and Plant Manager defendants are individuals whose identities are not yet fully known but who served as agents and employees of the defendant Processors. At all relevant times, these individuals acted within the line and scope of their employment. Their wrongful acts, including the direct exchange of competitively sensitive wage data with rival plants, were calculated to and did benefit their corporate employers by reducing labor costs. This conduct was known to, authorized by, and subsequently ratified by their respective employers.

17. All defendants, named and fictitious, participated in the same wage-fixing information exchange that directly suppressed wages paid to the plaintiffs causing damages.

18. All defendant producers, named and fictitious, subscribed to Agri Stats / WMS and attended meetings knowing Alabama plants and jobs were in the data set and that benchmark targets would be applied to Alabama wages causing damages to the plaintiffs and those similarly situated in this jurisdiction.

## A. The Poultry Processing Industry and its Susceptibility to Collusion

1. The poultry processing industry possesses numerous structural characteristics, that make it uniquely susceptible to the type of long-running, collusive scheme alleged herein. These factors created an environment where the conspiracy could not only form but thrive for decades.

24

2. The defendant processors collectively control the majority of the U.S. poultry market. This high concentration limits the number of independent competitors, magnifies the conspirators' collective market power over labor, and simplifies the process of coordinating and policing a collusive agreement.

3. The cost of establishing a new, vertically integrated poultry processing complex, upon information and belief, exceeds $100 million. This immense capital requirement effectively prevents new competitors from entering the market to challenge the incumbents and disrupt their collusive arrangement.

4. Workers performing similar production and maintenance roles at different processing plants are largely interchangeable. This fungibility of labor makes it simple for competitors to compare and align compensation for any given position across the industry.

5. The workforce in poultry processing is disproportionately comprised of vulnerable populations, including marginalized citizens, immigrants, refugees, and asylum-seekers with limited English proficiency, education, and alternative employment options. This creates a captive labor pool that cannot easily respond to suppressed wages by seeking work elsewhere, allowing the defendants to depress compensation without fear of losing their workforce.

**B. The Decades-Long Conspiracy to Suppress Employee Compensation**

1. Upon information and belief, beginning as early as January 1, 2000, and continuing until at least July 20, 2021, the defendant Processors and their co-conspirators entered into a continuing contract, combination, and conspiracy to illegally fix, depress, maintain, and stabilize the compensation paid to their employees, including the plaintiffs, resulting in damage to plaintiffs.

2. The primary motivation for this conspiracy was to reduce labor costs—a substantial portion of each processor's operating expenses—and thereby maximize corporate profits at the direct expense of their employees. To facilitate this scheme, compensation decisions were centralized at the corporate headquarters of each defendant Processor rather than being made at the local plant level.

## C. The Mechanics of the Unlawful Conspiracy

1. Defendant Producers did not passively receive WMS reports. Instead, competing processors formed a Poultry Industry Survey Group that collectively controlled the survey's scope, questions, participating companies, and the level of detail contained in results. A small Steering Committee of processor executives made the key decisions and met privately so that Defendants could speak candidly about compensation practices and align pay without oversight. WMS distributed survey results immediately before annual in-person compensation meetings, after which Defendants held private roundtables to coordinate how to apply the benchmarks to real-world pay decisions, including at Alabama plants.

2. The defendants executed their conspiracy through a sophisticated, multi-pronged strategy involving secretive in-person meetings, illicit information exchanges managed by third-party consultants, and direct communications between competitors.

3. A core component of the conspiracy was a series of annual in-person meetings of senior human resources and compensation executives from the competing defendant Processors.

4. These meetings were, upon information and belief, organized by a committee led by executives from defendants Tyson and Perdue, among others. Upon information and belief, these meetings were intentionally kept "off the books" to avoid creating a paper trail.

5. Upon information and belief these meetings, and the information shared, was/were to kept confidential.

6. During hours-long, private roundtable sessions executives from the defendants and others discussed survey results, agreed upon compensation rates for the coming year and chastised any processor that had deviated from previously fixed pay levels.

7. Webber, Meng, Sahl and Company, Inc. (WMS): WMS was hired to provide data to the producers under the guise of abiding by applicable regulations. WMS unwittingly provided the infrastructure for the conspiracy under a "veneer of legality." Its president, Jonathan Meng, repeatedly warned the defendant

Processors that their practice of exchanging future, disaggregated compensation data violated the applicable laws. Despite these warnings, WMS, at the direction of the processors, designed surveys to collect this data, resulting in sham anonymization, and its representatives were excluded from private "roundtable sessions" where illicit and conspiratorial agreements were being made.

8. The survey's framework was used as a pretext to hide Defendants' conspiracy from employees and the public. By routing their wage exchanges through WMS while dictating unlawful levels of detail and future-looking content, Defendants concealed material facts: that they were no longer competing for labor in Alabama and were instead jointly suppressing compensation. This concealment and coordinated conduct form part of the fraudulent scheme, civil conspiracy, and unjust enrichment described in this Complaint.

**2. Illicit Information Exchanges Facilitated by Agri Stats**

1. **Webber, Meng, Sahl & Co. (WMS)** was hired to administer an annual "Poultry Industry Compensation Survey," providing a veil of legality to the information exchange.

   a. The survey was designed by the processors' Steering Committee to collect detailed data on wages, salaries, and benefits. Crucially, against the repeated warnings of WMS President Jonathan Meng the survey collected future compensation data, including planned salary increases and their timing.

   b. Mr. Meng ultimately concluded that the processors hired WMS to "create an appearance of compliance" while they "continued to exchange disaggregated and deanonymized compensation data and continued to discuss and harmonize their compensation practices."

2. The survey employed an anonymization technique, replacing company names with letter codes. However, the reports contained such granular detail (e.g., plant locations, employee counts) that participants, Defendants, could easily identify their specific competitors. A former Perdue employee confirmed this, stating it was easy when "you're sitting in a meeting and the person across from you [from a competing processor] is reporting on what they do."

3. **Agri Stats, Inc.** provided the mechanism for continuous monitoring and enforcement of the conspiracy.

    a.   Agri Stats collected and distributed monthly reports containing terabytes of detailed, current, non-public, and plant-specific compensation data from over 95% of U.S. poultry processors.

    b.   Agri Stats collected non-public, confidential, and proprietary wage and compensation data from competing poultry processors and redistributed that data among the processors on a monthly basis, including current hourly wages and salaries broken down by plant and job position. This data was not publicly available and could only be accessed by processors that reciprocated by submitting their own detailed compensation information, thereby enabling coordinated wage decision-making among competitors.

    c.   Agri Stats falsely represented that its compensation reports were anonymized or aggregated, while knowingly distributing highly granular, disaggregated data that processors could and did reverse-engineer to identify which competitors and which specific plants corresponded to particular wage figures. This sham anonymization concealed the true nature of the inter-company wage exchange while allowing processors to coordinate compensation with precision.

    d.   Despite claims of anonymity, the data was easily decodable. A former Perdue employee stated the anonymity claim was "just bullshit" and that every participating processor "knew precisely which company reported which data."

    e.   The monthly frequency of the reports allowed defendants to ensure no co-conspirator broke ranks by raising wages. A former Butterball executive confirmed there was "no question about it" that Agri Stats was used by processors to "monitor each other's performance." The crucial role of this data is underscored by the public statement of Joe Sanderson, then-CEO of Sanderson Farms, that "we live and die by Agri Stats."

    f.   Agri Stats travelled between each Defendant Processor regularly and discussed the nonpublic, proprietary data at those meetings, including but not limited to quarterly in-person meetings with each processor's

executives, involving travel between producers and discussion of non-public data.

g. Agri Stats representatives physically visited each co-conspirator defendant processor plant, conducting on-site meetings lasting at least one week to establish data-collection processes, identify internal payroll data sources, and standardize reporting formats. These visits embedded Agri Stats directly inside processor operations and facilitated the ongoing exchange of sensitive wage information.

h. Agri Stats employees and representatives assisted poultry processors in interpreting and decoding Agri Stats reports, including by explaining how to determine which competitor submitted specific compensation data. Agri Stats personnel trained processor management on how to extract competitive intelligence from the reports, further enabling coordinated wage suppression.

i. Agri Stats audited the raw wage data submitted by processors to ensure accuracy and consistency, which ensured that no processor could deviate from agreed-upon compensation levels by secretly paying higher wages. These audits functioned as a policing and enforcement mechanism, reinforcing adherence to coordinated wage suppression.

j. Through the monthly dissemination of current wage data, Agri Stats enabled co-conspirator defendant processors to continuously monitor each other's compensation levels and detect deviations in near real time. This continuous monitoring reduced competitive uncertainty and stabilized wages across processors.

k. Agri Stats data was reviewed at individual poultry processing plants, not merely at corporate headquarters. Corporate officers and plant managers used Agri Stats benchmarks to compare plant wages against competitors and ensure that wages remained within coordinated ranges. Agri State corporate personnel were tasked with visiting plants to ensure wages stayed precisely aligned with Agri Stats benchmarks.

l. Agri Stats' reports were not sold to the public, employees, or unions. Agri Stats concealed the existence and mechanics of coordinated wage suppression from workers.

m. Because Agri Stats regularly travelled between processors, discussed proprietary wage data with each, and audited their submissions, it acted as a central hub connecting competing employers and transmitting information that allowed the conspiracy to function, persist, and remain concealed.

n. Each of the foregoing acts was intentional, knowing, and undertaken in furtherance of a common scheme to suppress and stabilize wages. Agri Stats knew that the compensation data it collected, analyzed, audited, and redistributed would be used by competing poultry processors to coordinate wage decisions, and Agri Stats substantially assisted that scheme through repeated, affirmative conduct resulting in harm to plaintiffs.

### 3. Direct Plant-to-Plant Communications

1. The conspiracy was furthered by frequent, direct communications between managers at competing plants. Plant managers and human resources personnel regularly contacted their counterparts at nearby rival facilities to request and exchange current and future wage and benefit information.

2. A former human resources manager who worked for both Perdue and George's admitted to this practice, stating, "We would collaborate. We would talk among each other to see what they were doing for pay."

### D. Fraudulent Concealment of the Conspiracy

1. The defendants took active and deliberate steps to fraudulently conceal their unlawful conduct from their employees and the public. These steps included:

    a. Holding secret, "off the books" meetings and requiring in-person attendance to avoid a paper trail.

    b. Using third-party consultants and sham data anonymization techniques to create a facade of legality for their illicit information exchanges.

30

c.  Making false and misleading public statements on company websites and in advertisements claiming they paid "competitive wages," all while actively conspiring to suppress those same wages.

2.  Following increased scrutiny, including the filing of a separate price-fixing lawsuit in 2016, several defendant Processors abruptly withdrew from the WMS survey, citing the "advice of legal counsel." This change in behavior is compelling evidence of the defendants' consciousness of guilt.

**E. Harm to the Plaintiffs**

1.  The direct and intended result of the defendants' conspiracy was the artificial suppression of worker compensation. While worker productivity skyrocketed with processing line speeds increasing by **54%** between 1999 and 2015 the real-world earnings of those workers plummeted. During that same period, inflation-adjusted hourly wages for poultry processing workers *decreased* by more than **1%**.

2.  The small annual raises that workers did receive were often entirely offset by corresponding increases in health insurance premiums. As a direct result of the conspiracy, the plaintiffs and other similarly situated workers were paid materially less than they would have been in a competitive market, which systematically transferred wealth from the plaintiffs and the class to the defendants in the form of artificially inflated corporate profits.

**F. Specific Allegations Against Each Defendant**

1.  **The Perdue Defendants:** Perdue was a central and long-standing participant in the conspiracy. Its employees attended every annual compensation meeting between 2001 and 2019, submitted detailed compensation data to WMS every year from 2000 to 2019, and subscribed to Agri Stats. A former Perdue employee described the company's CEO as an "Agri Stats guru" and stated that Perdue managers regularly collaborated with rivals to exchange wage information.

2.  Perdue employees knew that compensation data submitted through WMS was readily attributable to specific companies and plants, particularly during in-person meetings where competitors discussed their own reported data. A former Perdue employee explained that the source of compensation figures was obvious because

31

"you're sitting in a meeting and the person across from you is reporting on what they do."

3.  Upon information and belief, Perdue used the Agri-Stats data to incorporate and monitor the conspiracy to suppress wages and ensure compliance by all defendants with the conspiracy.

4.  Perdue subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors including co-conspirator defendants on a monthly basis.

5.  Perdue regularly attended the annual meetings of co-conspirator defendants and obtained and exchanged competing processors information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels.

6.  Perdue submitted data to the annual WMS survey during multiple years and subscribed to Agri Stats to exchange plant-specific compensation data on a monthly basis.

7.  Perdue regularly exchanged current and future wages with managers from co-conspirator defendants and any planned future wage increases.

8.  Perdue brought Agri Stats personnel into the company to train management on how to extract and interpret competitor-specific wage information from Agri Stats reports, despite the nominal claim that the data was anonymous.

9.  Perdue employees reviewed disaggregated Agri Stats wage data during meetings held at Perdue poultry processing plants, using competitor comparisons to guide wage decisions at individual facilities rather than responding to local labor market forces.

10. Perdue and other co-conspirator defendants continued to reveal and discuss their specific compensation practices, future compensation plans, and target wage levels "behind closed doors", even after being warned that such conduct was inconsistent with lawful compensation benchmarking.

11. Perdue's knowing participation in repeated data exchanges, secret meetings, and direct communications predictably suppressed wages and benefits paid to poultry

processing workers, transferring economic value from workers to Perdue in the form of reduced labor costs and increased profits.

12. Each of the foregoing acts was intentional, knowing, and undertaken in concert with other co-conspirator defendants pursuant to a common plan to suppress employee compensation. Perdue knowingly joined and materially advanced a coordinated scheme that foreseeably caused economic harm to poultry workers, including Plaintiffs, and unjustly enriched Perdue at the expense of plaintiffs and those similarly situated.

13. **The Tyson Defendants:** Tyson was a leader of the conspiracy, serving on the Steering Committee that directed the WMS surveys. A Tyson Vice President of Compensation admitted in a 2015 email that "hourly production projected budgets" were "typically a discussion item" at the secret meetings. From 2013 to 2015, Tyson single-handedly paid WMS to conduct an even more granular survey to facilitate the exchange of raw, plant-level data, despite WMS's warnings that this violated the applicable law.

14. Tyson subscribed to Agri Stats and used it to exchange current, disaggregated, readily decodable, plant-specific compensation data with competing poultry processors on a monthly basis.

15. Tyson relied on Agri Stats reports to compare its wages to competitors and to keep its compensation within coordinated ranges rather than responding independently to labor market conditions.

16. Tyson employees and executives regularly attended secret, off-the-books Poultry Industry Compensation Committee meetings, including meetings held at the Hilton Sandestin Resort in Destin, Florida, where competing poultry processors exchanged non-public compensation information and discussed wages and benefits. These meetings were intentionally conducted outside normal reporting channels and without transparency to employees, and they facilitated coordinated wage decisions rather than independent competition.

17. Tyson was represented on the Steering Committee that controlled the structure, scope, and content of the WMS poultry compensation surveys for most of the relevant period. Through this role, Tyson participated in decisions to expand the surveys beyond generalized averages and to require more granular, plant-level,

33

and job-specific compensation information, increasing the usefulness of the surveys for coordinating wages rather than benchmarking competitively.

18. Tyson initiated, designed, and funded a supplemental compensation survey that collected raw, disaggregated, plant-level wage data for production, maintenance, and refrigeration workers. Tyson requested this survey despite warnings that its format violated accepted safeguards and facilitated identification of individual companies' and plants' wage data. Tyson paid for the survey, dictated its structure, and caused its results to be distributed to participating processors.

19. Tyson employees recruited other poultry processors to participate in the Tyson-sponsored survey and encouraged their submission of detailed wage data. Participants proceeded despite express warnings that the survey format defeated anonymity and allowed compensation data to be traced back to specific companies and plants.

20. Tyson regularly attended the annual meetings of co-conspirator defendants and obtained and exchanged competing processors information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels.

21. In advance of and for use at these secret compensation meetings, Tyson employees submitted highly detailed current and future compensation data to WMS, knowing and intending that the data would be distributed to, reviewed by, and discussed among competing poultry processors. Tyson made these submissions repeatedly over multiple years as part of the same coordinated scheme.

22. Tyson submitted data to the annual WMS survey during multiple years and subscribed to Agri Stats to exchange plant-specific compensation data on a monthly basis.

23. Tyson submitted highly detailed current compensation data to WMS in advance of meetings, knowing/expecting it would be distributed to and examined by competitors including co-conspirator defendants.

24. Tyson regularly exchanged current and future wages with managers from co-conspirator defendants and any planned future wage increases.

25. Tyson set compensation schedules and paid workers at "artificially depressed, wage fixed rates.

34

26. Tyson employees directly communicated with human-resources managers at competing poultry plants, including co-conspirator defendants to exchange current and future wage rates, including planned increases. These bilateral exchanges further reduced competition for labor and reinforced coordinated wage suppression.

27. As a result of this conduct, Tyson established compensation schedules and paid poultry workers' wages and benefits that were artificially suppressed and stabilized, rather than competitively determined. Tyson retained the financial benefit of reduced labor costs while workers bore the harm of depressed compensation resulting in damages to plaintiffs.

28. **Pilgrim's Pride Corporation:** Pilgrim's Pride was a core member of the conspiracy. A former employee stated that the company explicitly used Agri Stats data to set wages with the goal of paying "exactly in the middle" of the reported industry average. Its executives also requested that plant managers obtain current and future compensation information directly from competitors.

29. Pilgrim's subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

30. Pilgrim's regularly attended the annual meetings of co-conspirator defendants and obtained and exchanged competing processors information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels. In 2017, Pilgrim's withdrew from the annual meeting on the advice of counsel, demonstrating consciousness of its illegal conduct. However, they resumed participation in these meetings in 2018 and 2019.

31. Pilgrim's employees submitted detailed compensation data to WIMS for inclusion in the annual Poultry Industry Compensation Surveys. Pilgrim's knew and intended that this data, including current wages and planned future increases, would be distributed to and reviewed by competing processors during compensation meetings and related discussions.

32. Pilgrim's was among the co-conspirator defendants that controlled and influenced the design and operation of the WMS surveys, including decisions to collect granular, plant-level and job-specific compensation data. Pilgrim's participated in

surveys structured in a manner that allowed competitors, including co-conspirator defendants, to identify and compare each other's compensation practices.

33. Pilgrim's regularly exchanged current and future wages with managers from co-conspirator defendants and any planned future wage increases.

34. Pilgrim's used Agri Stats data at both corporate and plant levels, reviewing competitor compensation benchmarks to ensure that wages paid at individual Pilgrim's facilities remained aligned with industry benchmarks. Corporate personnel reviewed Agri Stats data with plant management to guide wage decisions.

35. In addition to survey-based exchanges, Pilgrim's Pride employees directly exchanged current and future wage information with employees of competing poultry processors. For example, Pilgrim's personnel exchanged wage information with Tyson employees regarding planned wage rates at specific plants, reducing uncertainty and reinforcing coordinated wage practices.

36. According to WMS President Jonathan Meng, Pilgrim's and other processors continued to discuss specific compensation practices, future wage plans, and target pay levels "behind closed doors", even after warnings that such exchanges were inconsistent with lawful benchmarking practices. Pilgrim's nevertheless continued participating in the surveys and meetings.

37. Pilgrim's established compensation schedules using survey results and Agri Stats benchmarks to align wages across its poultry processing facilities, rather than allowing wages to be determined by local labor supply and demand.

38. Through its participation in repeated data exchanges, secret meetings, and direct communications, Pilgrim's paid poultry processing workers, including the plaintiffs, wages and benefits that were suppressed and stabilized, transferring economic value from workers to Pilgrim's in the form of reduced labor costs.

39. Pilgrim's operated poultry processing facilities employing workers in Alabama and implemented compensation practices at those Alabama facilities that were informed by and aligned with the coordinated benchmarks and exchanges described above. These acts were directed at and caused harm to Alabama workers, including Plaintiffs.

36

40. Each of the foregoing acts was intentional, knowing, and undertaken in concert with others. Pilgrim's knowingly participated in a coordinated course of conduct that foreseeably suppressed employee compensation and unjustly enriched Pilgrim's at the expense of poultry processing workers, including Plaintiffs.

41. **Sanderson Farms, Inc.:** Sanderson subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

42. Sanderson employees submitted detailed compensation data to WMS for use in the annual Poultry Industry Compensation Survey, with the understanding that the data would be shared with and reviewed by competing processors at the compensation meetings including co-conspirator defendant processors. This included current wage information used to benchmark and align compensation across companies.

43. Sanderson Farms participated in surveys that were structured to allow competitors, including co-conspirator defendant processors, to identify the source of compensation data, including through granular plant-level details. Survey participants, including Sanderson Farms, reviewed compensation information in formats that allowed executives to match wage figures to specific competing companies and facilities including co-conspirator defendant processors.

44. Sanderson regularly attended the annual meetings of co-conspirator defendants and obtained and exchanged competing processors information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels.

45. Sanderson Farms was deeply integrated into the conspiracy, with its then-CEO publicly stating, "we live and die by Agri Stats." Like other conspirators, Sanderson Farms attended the secret annual meetings before withdrawing from the WMS survey group in 2012, informing other members that it was doing so "On the advice of legal counsel."

46. Following Sanderson Farms' merger with Wayne Farms, the resulting Wayne-Sanderson entity continued poultry processing operations using compensation structures informed by industry benchmarking practices, including Agri Stats data, thereby perpetuating the effects of the coordinated wage-setting scheme.

37

47. Through the foregoing conduct, Sanderson Farms paid poultry processing workers, including plaintiffs, wages that were suppressed and stabilized, transferring economic value from workers to Sanderson in the form of reduced labor costs and increased profitability.

48. Each of the foregoing acts was intentional, coordinated, and undertaken in concert with others. Sanderson Farms knowingly participated in a shared course of conduct that predictably suppressed employee compensation and unjustly benefited Sanderson at the expense of poultry processing workers, including Plaintiffs.

49. **The Koch Defendants:** (Koch Foods, Inc. & Koch Foods of Alabama, LLC) was a consistent participant, with its employees attending many of the annual compensation meetings. The company submitted data to the annual WMS survey during multiple years and subscribed to Agri Stats to exchange plant-specific compensation data on a monthly basis.

50. Koch subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

51. Koch relied on Agri Stats reports to compare its wages against competitors and to guide compensation decisions, rather than determining wages independently based on local labor conditions.

52. The Koch Defendants used Agri Stats wage benchmarks at both corporate and plant levels, reviewing competitor compensation data with plant management to ensure that wages at Koch facilities remained aligned with industry benchmarks. These practices replaced independent wage setting with coordinated benchmarking.

53. Koch regularly attended the annual meetings of co-conspirator defendants and obtained and exchanged competing processors information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels.

54. In addition to survey-based exchanges, the Koch Defendant employees directly exchanged current and future wage information with employees of competing poultry processors, including discussions of wage levels and timing of wage

38

increases. These communications reduced uncertainty and reinforced coordinated compensation practices.

55. Koch submitted data to the annual WMS survey during multiple years and subscribed to Agri Stats to exchange plant-specific compensation data on a monthly basis.

56. Through its participation in repeated data exchanges, secret meetings, and direct communications, Koch Foods paid poultry processing workers wages and benefits that were suppressed and stabilized, transferring economic value from workers to Koch in the form of reduced labor costs and increased profitability.

57. The Koch Defendants operated poultry processing facilities and related operations employing workers in Alabama and implemented compensation practices at those Alabama facilities that were informed by and aligned with the coordinated benchmarks and exchanges described above. These acts were directed at and caused harm to workers in this jurisdiction, including Plaintiffs.

58. Each of the foregoing acts was intentional, knowing, and undertaken in concert with others. The Koch Defendants knowingly joined and materially advanced a coordinated scheme that foreseeably suppressed employee compensation and unjustly enriched Koch at the expense of poultry processing workers, including Plaintiffs.

59. **Agri Stats, Inc.:** Agri Stats was the central monitoring and enforcement arm of the conspiracy as previously stated herein. It collected and distributed detailed, non-public, and readily decodable compensation data on a monthly basis. A former Perdue employee stated Agri Stats was responsible for "collusion in the poultry industry," and by admission of a former producer, confirmed that Agri Stats was used to monitor each other's performance. Agri Stats profited handsomely from its role, charging each processor substantial fees.

60. Agri Stats embedded itself within processor operations, repeatedly collected and audited non-public compensation data, traveled between competitors to discuss that data, trained processor personnel to interpret and apply competitor wage information, and redistributed detailed benchmarking reports that were used to guide actual wage decisions.

61. Agri Stats knew that its conduct would be used to align compensation practices rather than foster independent decision-making, and it continued that conduct despite the foreseeable and intended effect of depressing wages paid to poultry processing workers, including Plaintiffs. By doing so, Agri Stats materially advanced and concealed the conspiracy, causing direct harm to workers in this jurisdiction including the plaintiffs and unjustly enriching itself and the participating processors.

62. Agri Stats was not a passive service provider. It designed, executed, and enforced the information exchanges that allowed competing poultry processors to coordinate compensation practices while concealing that coordination from workers, including the plaintiffs. Through repeated affirmative acts, Agri Stats knowingly facilitated conduct that predictably suppressed wages and caused economic harm to Plaintiffs.

63. Through the foregoing acts, Agri Stats knowingly and substantially assisted in a coordinated scheme among competing poultry processors to suppress and stabilize employee compensation.

64. **Cargill Meat Solutions:** Cargill employees attended regular annual meetings, and every annual meeting between 2001 and 2019 where executives from competing poultry processors gathered to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of the plaintiffs and those similarly situated at artificially depressed levels.

65. Cargill submitted data to the annual WMS survey during multiple years and subscribed to Agri Stats to exchange plant-specific compensation data on a monthly basis.

66. Cargill exchanged current and future wages with managers of co-conspirator defendants and any planned future wage increases.

67. Cargill and other processors, including co-conspirator defendants, continued to reveal and discuss specific compensation practices, future wage plans, and target pay levels behind closed doors, even after being warned that such exchanges posed legal risks and were inconsistent with lawful benchmarking safeguards.

40

68. Through the foregoing conduct, Sanderson Farms paid poultry processing workers, including plaintiffs, wages that were suppressed and stabilized, transferring economic value from workers to Sanderson in the form of reduced labor costs and increased profitability.

69. Cargill operated poultry processing facilities and related operations employing workers in Alabama and implemented compensation practices at those Alabama facilities that were informed by and aligned with the coordinated benchmarks and exchanges described above. These acts were directed at and caused harm to Alabama workers, including Plaintiffs.

70. Each of the foregoing acts was intentional, knowing, and undertaken in concert with others. Cargill knowingly joined and materially advanced a coordinated scheme that foreseeably suppressed employee compensation and unjustly enriched Cargill at the expense of poultry processing workers, including Plaintiffs.

71. **Fictitious Defendants A-BB:** The individual John and Jane Doe defendants, including but not limited to HR and Plant Managers, successors, were the agents who carried out the conspiracy on the ground. Acting within the scope of their employment and at the direction of their corporate superiors, they engaged in regular bilateral exchanges of current and future wage information with managers at rival plants. These acts directly furthered the conspiracy and benefited their employers by ensuring local pay rates remained aligned and suppressed.

72. The foregoing factual allegations give rise to the following legal claims for relief.

CAUSES OF ACTION
COUNT I: FRAUD & FRAUDULENT CONCEALMENT (Against All defendants)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. Under Alabama law, a claim for fraudulent concealment is established by showing (1) a duty on the part of the defendant to disclose a material fact; (2) concealment or nondisclosure of that fact; (3) inducement of the plaintiff to act; and (4) action by the plaintiff to his or her injury. *Chiepalich v. Chiepalich*, 392 So. 3d 467 (Ala. 2023); APJI 16.05.

41

3. Defendants had a duty to disclose to their employees, the plaintiffs, the existence of a conspiracy to artificially fix and suppress their wages. This duty arose from the particular circumstances of the employment relationship and the defendants' superior knowledge of the scheme.

4. Defendants actively and intentionally concealed this material fact by holding off the book meetings, using sham data anonymization to create a facade of legality, and making false public statements about offering competitive wages.

5. Defendants suppressed the existence of their inter-company wage-coordination scheme, a material fact plaintiffs could not reasonably discover, and that would have changed their employment and bargaining decisions

6. This fraudulent concealment induced the plaintiffs to continue their employment with the defendant Processors under the false belief that their compensation was determined by legitimate market forces.

7. As a direct and proximate result of this concealment, Plaintiffs continued to provide their labor for artificially depressed compensation, thereby suffering actual economic damage in the form of lost wages and benefits.

**COUNT II: UNJUST ENRICHMENT (Against Defendant Employer Processors)**

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. The plaintiffs provided something of value to the defendants, their labor;

3. The defendants requested Plaintiffs' labor efforts;

4. The plaintiffs are entitled by law to fair compensation; and

5. Fair compensation is necessary to prevent the defendants from being unjustly enriched. APJI 11.18; *Matador Holdings, Inc. v. HoPo Realty Investments, L.L.C.*, 77 So. 3d 139 (Ala. 2011).

6. The plaintiffs provided a benefit to the defendant Processors in the form of their labor. The defendant Processors knowingly accepted and retained this benefit.

7. Processors retained the benefit of unlawfully reduced labor costs in this jurisdiction.

42

8. The retention of this benefit is unjust because it was obtained through "unconscionable conduct," namely the fraudulent, coercive, and long-running conspiracy to illegally suppress employee wages. *Jordan v. Mitchell*, 705 So. 2d 453 (Ala. Civ. App. 1997). The defendant Processors have been unjustly enriched by the value of the labor for which they systematically and illegally underpaid the plaintiffs.

## COUNT III: NEGLIGENCE (Against All Defendants)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. Defendants owed a duty of reasonable care to their employees and to the labor market to not engage in conduct that would unlawfully restrain trade and artificially suppress wages and cause damages to the plaintiffs and those similarly situated in this jurisdiction.

3. Defendants breached this duty by forming, implementing, monitoring, and concealing a conspiracy that systematically dismantled the competitive mechanisms for wage-setting in the poultry processing industry and caused damages to the plaintiffs and those similarly situated in this jurisdiction.

4. This breach was the direct and proximate cause of the plaintiffs' harm, as it resulted in their compensation being set at artificially depressed levels, causing significant economic damages.

## COUNT IV: WANTONNESS (Against All Defendants)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. Wantonness is conduct carried on with a reckless or conscious disregard of the rights or safety of others, with an awareness that harm will likely result. *APJI 9.00; Ala. Code § 6-11-20(b)(3).*

3. The defendants' participated in a multi-decade, systematic, and fraudulently concealed conspiracy to suppress the wages of a vulnerable workforce for the purpose of maximizing corporate profit with a conscious and reckless disregard for the rights of the plaintiffs.

4. Defendants knew or should have known that their actions in eliminating labor market competition would probably and likely result in substantial economic harm to their employees and cause damages to the plaintiffs and those similarly situated in this jurisdiction. Their decision to proceed with this scheme for over twenty years constitutes wantonness and directly and proximately caused damages to plaintiffs.

### COUNT V: CIVIL CONSPIRACY (Against All Defendants)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. A civil conspiracy is a combination of two or more persons to do something unlawful or to do something lawful by unlawful means. The underlying torts for this conspiracy include, but are not limited to, fraud, fraudulent concealment, and wantonness, which are sufficient to support a conspiracy claim under Alabama law.

3. As detailed in the Factual Allegations, all defendants agreed and worked together to achieve a common, unlawful end: the suppression of employee compensation, to the detriment of the plaintiffs causing damages to the plaintiffs and those similarly situated in this jurisdiction.

4. Defendants achieved this end through unlawful means, including secret meetings, fraudulent information exchanges, and other tortious acts as outlined herein. This concerted action directly and proximately caused the plaintiffs' economic and emotional harm.

### COUNT VI: OUTRAGE (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS) (Against All Defendants)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. Defendants' conduct, a multi-decade, secret scheme to exploit a captive and vulnerable workforce for corporate profit by illegally suppressing their wage, is so outrageous in character and so extreme in degree that it goes beyond all bounds of decency, and it is regarded as atrocious and utterly intolerable in a civilized society.

44

3. This intentional and extreme conduct caused the plaintiffs severe emotional distress, including feelings of anxiety, hopelessness, and betrayal, resulting from the knowledge that their hard labor was systematically undervalued through an illegal and fraudulent scheme.

4. The defendants intended to cause, or knew their conduct was likely to cause, emotional distress of Plaintiffs and those similarly situated in this jurisdiction;

5. The defendants' conduct was extreme and outrageous;

6. The defendants' conduct caused emotional distress; and

7. The distress to Plaintiffs was severe.

### COUNT VII: INTENTIONAL INTERFERENCE WITH A BUSINESS RELATIONSHIP (Non-employer co-conspirators)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. Each Plaintiff had a protectible business relationship with their respective employer (one of the defendant Processors).

3. Employment relationships existed between each Plaintiff and their direct employer.

4. The co-conspirator defendants intentionally interfered with these relationships by engaging in a conspiracy to fix wages at artificially low levels, thereby altering a fundamental term of the employment relationship to the plaintiffs' detriment.

5. The co-conspirator defendants knew or should have known that their actions would cause damages to workers in this jurisdiction, including the plaintiffs and those similarly situated.

6. This intentional interference directly and proximately damaged the plaintiffs by causing them to receive suppressed compensation.

### COUNT VIII: VICARIOUS LIABILITY & RATIFICATION (Against Defendant Processors)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

45

2. Pursuant to APJI 5.00, 5.08, 9.03, and Ala. Code § 6-11-27, the Defendant Processors are vicariously liable for the wrongful acts of their agents and employees, including the individual HR and Plant Manager Defendants.

3. These employees acted within the line and scope of their employment when they participated in the conspiracy, as their acts of exchanging wage data were part of their job responsibilities and were calculated to benefit their employers by lowering labor costs.

4. The defendant Processors, with full knowledge of the facts and circumstances of this conduct, ratified the wrongful acts of their employees by accepting the benefits of suppressed labor costs and continuing the conspiracy for over two decades which directly and proximately caused damages to the plaintiffs.

**PRAYER FOR RELIEF**

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs respectfully request that this Honorable Court enter a judgment in their favor and against the defendants, jointly and severally, and award the following relief:

1. A judgment in favor of the plaintiffs and against the defendants, not to exceed $74,999.00 per Plaintiff;

2. An award of compensatory damages in an amount to be determined at trial for lost wages, salaries, and benefits;

3. An award of damages for mental anguish and emotional distress in an amount to be determined at trial;

4. An award of punitive damages in an amount sufficient to punish the defendants for their fraudulent, wanton, and malicious conduct and to deter similar conduct in the future;

5. An award of pre-judgment and post-judgment interest as allowed by law;

6. An award for the costs of this action and reasonable attorneys' fees; and

7. Such other and further relief as the Court deems just, equitable, and proper.

/s/ Christina D. Crow
One of the attorneys for Plaintiffs


OF COUNSEL:
Christina D. Crow (CRO064)
C. Elizabeth Littell (LIT028)
Kijana Mitchell (MIT080)
JINKS CROW, PC
219 N. Prairie Street
Union Springs, AL 36089
334-738-4225
christy.crow@jinkscrow.com
lisa.littell@jinkscrow.com
kijana.mitchell@jinkscrow.com

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

/s/ Christina D. Crow
OF COUNSEL



**Service on Defendants as follows:**

Agri Stats, Inc.
c/o Brenda Sievers
6510 Mutual Dr
Fort Wayne, IN 46825

Perdue Farms, Inc.
c/o CT Corporation System
2 N Jackson Street, Suite 605
Montgomery, AL 36104

47

Perdue Foods LLC
c/o CT Corporation System
2 N Jackson Street, Suite 605
Montgomery, AL 36104

Tyson Foods, Inc.
c/o United Agent Group Inc.
1521 Concord Pike, Suite 201
Wilmington, DE 19803

Pilgrim's Pride Corporation
c/o CT Corporation System
2 North Jackson St, Suite 605
Montgomery, AL 36104

Wayne-Sanderson Farms LLC
c/o CT Corporation System
2 N Jackson Street, Suite 605
Montgomery, AL 36104

Wayne Farms, LLC
c/o CT Corporation System
2 N Jackson Street, Suite 605
Montgomery, AL 36104

Cargill Meat Solutions, Inc.
c/o United Agent Group Inc.
4000 Eagle Point Corporate Dr
Birmingham, AL 35242

Continental Grain Company
c/o CT Corporation System
2 N Jackson Street, Suite 605
Montgomery, AL 36104

Koch Foods, Inc.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

Koch Foods of Alabama, LLC
c/o CT Corporation System
2 N Jackson Street, Suite 605
Montgomery, AL 36104

Peco Foods Inc.
c/o Patrick Noland
1101 Greensboro Ave
Tuscaloosa, AL 35401

Foster Poultry Farms, LLC
c/o CT Corporation System
2 North Jackson St., Suite 605
Montgomery, AL 36104

| State of Alabama<br>Unified Judicial System<br>Form C-34  Rev. 4/2024 | **SUMMONS**<br>**- CIVIL -** | **Court Case Number**<br>09-CV-2026-900001.00 |
|---|---|---|

**IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA COUNTY, ALABAMA**
**JAMES HERBERT AYERS ET AL V. AGRI STATS, INC. ET AL**

**NOTICE TO:** WAYNE FARMS, LLC, C/O CT CORPORATION SYSTEM 2 N JACKSON STREET, SUITE 605, MONTGOMERY, AL 36104

*(Name and Address of Defendant)*

THE COMPLAINT OR OTHER DOCUMENT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT, AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT OR OTHER DOCUMENT, WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE PLAINTIFF(S) OR ATTORNEY(S) OF THE PLAINTIFF(S),
Carolyn Elizabeth Littell

*[Name(s) of Attorney(s)]*

WHOSE ADDRESS(ES) IS/ARE: PO Box 350, Union Springs, AL 36089

*[Address(es) of Plaintiff(s) or Attorney(s)]*

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT OR OTHER DOCUMENT WERE SERVED ON YOU OR A JUDGMENT BY DEFAULT MAY BE RENDERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT OR OTHER DOCUMENT.

**TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY THE ALABAMA RULES OF CIVIL PROCEDURE TO SERVE PROCESS:**

☐ You are hereby commanded to serve this Summons and a copy of the Complaint or other document in this action upon the above-named Defendant.

☑ Service by certified mail of this Summons is initiated upon the written request below of    JAMES HERBERT AYERS
pursuant to the Alabama Rules of the Civil Procedure.    *[Name(s)]*

| 01/07/2026 | /s/ RASHAWN HARRIS | By: _____ |
|---|---|---|
| *(Date)* | *(Signature of Clerk)* | *(Name)* |

☑ Certified Mail is hereby requested.    /s/ Carolyn Elizabeth Littell

*(Plaintiff's/Attorney's Signature)*

**RETURN ON SERVICE**

*Certified Mail*

☐ Return receipt of certified mail received in this office on _____

*(Date)*

*Personal/Authorized*

☐ I certify that I personally delivered a copy of this Summons and the Complaint or other document to
_____ in _____ County, Alabama on _____

*(First and Last Name of Person Served)*    *(Name of County)*    *(Date)*

Document left:

☐ with above-named Defendant;

☐ with an individual authorized to receive service of process pursuant to Rule 4(c), Alabama Rules of Civil Procedure;

☐ at the above-named Defendant's dwelling house or place or usual place of abode with some person of suitable age and discretion then residing therein.

*Return of Non-Service*

☐ I certify that service of process of this Summons and the Complaint or other document was returned- Not Found

☐ I certify that service of process of this Summons and the Complaint or other document was refused by
_____ in _____ County, Alabama on _____ who is:

*(First and Last Name of Person Served)*    *(Name of County)*    *(Date)*

☐ the above-named Defendant;

☐ an individual authorized to receive service of process pursuant to Rule 4(c), Alabama Rules of Civil Procedure;

☐ As a designated process server pursuant to Rule 4(i)(1)(B), Alabama Rules of Civil Procedure, I certify that I am at least 19 years of age, I am not a party to this proceeding, and I am not related within the third degree by blood or marriage to the party seeking service of process.

| *(Type of Process Server)* | *(Server's Signature)* | *(Address of Server)* |
|---|---|---|
| *(Badge or Precinct Number of Sheriff or Constable)* | *(Server's Printed Name)* | |
| *(Badge or Precinct Number of Sheriff or Constable)* | *(Telephone Number of Designated Process Server)* | **Service Return Copy** |



## Service of Process Transmittal Summary

**TO:**    Dana Sharitt
Wayne Farms LLC
4110 CONTINENTAL DR
OAKWOOD, GA 30566-2800

**RE:**    **Process Served in Alabama**

**FOR:**    Wayne-Sanderson Farms LLC  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Re: JAMES HERBERT AYERS; HENRY B. BAKER; GREGORY MAURICE BANDY; HENRY BASKIN; GERNARDO LAMAR BLAKELY; ELLA R BROWN; HENRY CHARLES BROWN, JR.; JASMINE JINAE BROWN // To: Wayne-Sanderson Farms LLC |
| **CASE #:** | 09CV202690000100 |
| **NATURE OF ACTION:** | Employee Litigation - Discrimination |
| **PROCESS SERVED ON:** | C T Corporation System, Montgomery, AL |
| **DATE/METHOD OF SERVICE:** | By Traceable Mail on 01/20/2026 |
| **JURISDICTION SERVED:** | Alabama |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  UPS Next Day Air |
| | Image SOP |
| | Email Notification,  Dana Sharitt  dana.sharitt@waynesanderson.com |
| | Email Notification,  Mason Wood  mason.wood@waynesanderson.com |
| | Email Notification,  Zachary Grant  zachary.grant@waynesanderson.com |
| | Email Notification,  Debbie Herring  debbie.herring@waynesanderson.com |
| | Email Notification,  Judith Carswell  judith.carswell@waynesanderson.com |
| | Email Notification,  Madison Baker  madison.baker@waynesanderson.com |
| | Email Notification,  Tracy Moss  tracy.moss@waynesanderson.com |
| | Email Notification,  Toni Bynum  toni.bynum@waynesanderson.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System<br>2 North Jackson Street<br>Suite 605<br>Montgomery, AL 36104<br>866-401-8252<br>LargeCorporationTeam@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT



**CT Corporation**
**Service of Process Notification**
01/20/2026
CT Log Number 551138830

disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



RASHAWN F. HARRIS
BULLOCK COUNTY CIRCUIT CLERK
P.O. BOX 230
UNION SPRINGS, AL 36089

**CERTIFIED MAIL**®

9589 0710 5270 0072 2064 51

quadient
FIRST-CLASS MAIL
IMI
**$013.84**
01/07/2026 ZIP 36089
043M30286883

Wayne-Sanderson Farms LLC
c/o CT Corporation System
2 N Jackson Street, Suite 605
Montgomery, AL 36104



AlaFile E-Notice

09-CV-2026-900001.00

To:  WAYNE-SANDERSON FARMS LLC
     C/O CT CORPORATION SYSTEM
     2 N JACKSON STREET, SUITE 605
     MONTGOMERY, AL, 36104

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

JAMES HERBERT AYERS ET AL V. AGRI STATS, INC. ET AL
09-CV-2026-900001.00

The following complaint was FILED on 1/7/2026 7:57:59 AM

Notice Date:    1/7/2026 7:57:59 AM

RASHAWN HARRIS
CIRCUIT COURT CLERK
BULLOCK COUNTY, ALABAMA
P.O. BOX 230
UNION SPRINGS, AL, 36089

334-738-2280

| State of Alabama<br>Unified Judicial System<br>Form C-34  Rev. 4/2024 | SUMMONS<br>- CIVIL - | Court Case Number<br>09-CV-2026-900001.00 |
|---|---|---|

## IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA COUNTY, ALABAMA
## JAMES HERBERT AYERS ET AL V. AGRI STATS, INC. ET AL

**NOTICE TO:** WAYNE-SANDERSON FARMS LLC, C/O CT CORPORATION SYSTEM 2 N JACKSON STREET, SUITE 605, MONTGOMERY, AL 36104

*(Name and Address of Defendant)*

THE COMPLAINT OR OTHER DOCUMENT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT, AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT OR OTHER DOCUMENT, WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE PLAINTIFF(S) OR ATTORNEY(S) OF THE PLAINTIFF(S),
Carolyn Elizabeth Littell

*[Name(s) of Attorney(s)]*

WHOSE ADDRESS(ES) IS/ARE: PO Box 350, Union Springs, AL 36089

*[Address(es) of Plaintiff(s) or Attorney(s)]*

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT OR OTHER DOCUMENT WERE SERVED ON YOU OR A JUDGMENT BY DEFAULT MAY BE RENDERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT OR OTHER DOCUMENT.

### TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY THE ALABAMA RULES OF CIVIL PROCEDURE TO SERVE PROCESS:

[ ] You are hereby commanded to serve this Summons and a copy of the Complaint or other document in this action upon the above-named Defendant.

[x] Service by certified mail of this Summons is initiated upon the written request below of pursuant to the Alabama Rules of the Civil Procedure.

JAMES HERBERT AYERS
*[Name(s)]*

| 01/07/2026 | /s/ RASHAWN HARRIS | By: |
|---|---|---|
| *(Date)* | *(Signature of Clerk)* | *(Name)* |

[x] Certified Mail is hereby requested.      /s/ Carolyn Elizabeth Littell

*(Plaintiff's/Attorney's Signature)*

### RETURN ON SERVICE

*Certified Mail*

[ ] Return receipt of certified mail received in this office on _____

*(Date)*

*Personal/Authorized*

[ ] I certify that I personally delivered a copy of this Summons and the Complaint or other document to

_____ in _____ County, Alabama on _____

*(First and Last Name of Person Served)*      *(Name of County)*      *(Date)*

Document left:

[ ] with above-named Defendant;

[ ] with an individual authorized to receive service of process pursuant to Rule 4(c), Alabama Rules of Civil Procedure;

[ ] at the above-named Defendant's dwelling house or place or usual place of abode with some person of suitable age and discretion then residing therein.

*Return of Non-Service*

[ ] I certify that service of process of this Summons and the Complaint or other document was returned- Not Found

[ ] I certify that service of process of this Summons and the Complaint or other document was refused by

_____ in _____ County, Alabama on _____ who is:

*(First and Last Name of Person Served)*      *(Name of County)*      *(Date)*

[ ] the above-named Defendant;

[ ] an individual authorized to receive service of process pursuant to Rule 4(c), Alabama Rules of Civil Procedure;

[ ] As a designated process server pursuant to Rule 4(i)(1)(B), Alabama Rules of Civil Procedure, I certify that I am at least 19 years of age, I am not a party to this proceeding, and I am not related within the third degree by blood or marriage to the party seeking service of process.

_____                    _____                    _____
*(Type of Process Server)*          *(Server's Signature)*              *(Address of Server)*

_____                    _____
*(Badge or Precinct Number of Sheriff or Constable)*   *(Server's Printed Name)*

_____                    _____
*(Badge or Precinct Number of Sheriff or Constable)*   *(Telephone Number of Designated Process Server)*

DOCUMENT 9

ELECTRONICALLY FILED
1/7/2026 7:57 AM
09-CV-2026-900001.00
CIRCUIT COURT OF
BULLOCK COUNTY, ALABAMA
RASHAWN HARRIS, CLERK

| State of Alabama<br>Unified Judicial System<br><br>Form ARCiv-93    Rev. 9/25 | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Ca:<br>09 |
|---|---|---|

Date of Filing:          Judge Code:
01/07/2026

## GENERAL INFORMATION

**IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA**
**JAMES HERBERT AYERS ET AL v. AGRI STATS, INC. ET AL**

**First Plaintiff:** ☐ Business  ☑ Individual      **First Defendant:** ☑ Business  ☐ Individual
☐ Government  ☐ Other                                   ☐ Government  ☐ Other

**NATURE OF SUIT:** Select primary cause of action, by checking box (check only one) that best characterizes your action:

**TORTS: PERSONAL INJURY**

☐ WDEA - Wrongful Death
☐ TONG - Negligence: General
☐ TOMV - Negligence: Motor Vehicle
☐ TOWA - Wantonness
☐ TOPL - Product Liability/AEMLD
☐ TOMM - Malpractice-Medical
☐ TOLM - Malpractice-Legal
☐ TOOM - Malpractice-Other
☑ TBFM - Fraud/Bad Faith/Misrepresentation
☐ TOXX - Other: _____

**TORTS: PERSONAL INJURY**

☐ TOPE - Personal Property
☐ TORE - Real Property

**OTHER CIVIL FILINGS**

☐ ABAN - Abandoned Automobile
☐ ACCT - Account & Nonmortgage
☐ APAA - Administrative Agency Appeal
☐ ADPA - Administrative Procedure Act
☐ ANPS - Adults in Need of Protective Service

**OTHER CIVIL FILINGS (cont'd)**

☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture Appeal/
         Enforcement of Agency Subpoena/Petition to Preserve
☐ CVRT - Civil Rights
☐ COND - Condemnation/Eminent Domain/Right-of-Way
☐ CTMP - Contempt of Court
☐ CONT - Contract/Ejectment/Writ of Seizure
☐ TOCN - Conversion
☐ EQND - Equity Non-Damages Actions/Declaratory Judgment/
         Injunction Election Contest/Quiet Title/Sale For Division
☐ CVUD - Eviction Appeal/Unlawful Detainer
☐ FORJ - Foreign Judgment
☐ FORF - Fruits of Crime Forfeiture
☐ MSHC - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
☐ PFAB - Protection From Abuse
☐ EPFA - Elder Protection From Abuse
☐ QTLB - Quiet Title Land Bank
☐ FELA - Railroad/Seaman (FELA)
☐ RPRO - Real Property
☐ WTEG - Will/Trust/Estate/Guardianship/Conservatorship
☐ COMP - Workers' Compensation
☐ CVXX - Miscellaneous Circuit Civil Case

**ORIGIN:** F ☑ INITIAL FILING          P ☐ APPEAL FROM PROBATE
                                              COURT

A ☐ APPEAL FROM                          O ☐ OTHER
    DISTRICT COURT

**HAS JURY TRIAL BEEN DEMANDED?** ☑ YES ☐ NO     Note: Checking "Yes" does not constitute a demand for a
                                                   jury trial. (See Rules 38 and 39, Ala.R.Civ.P, for procedure)

**RELIEF REQUESTED:** ☑ MONETARY AWARD REQUESTED  ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:**
LIT028              1/7/2026 7:57:57 AM              /s/ Carolyn Elizabeth Littell
                    Date                              Signature of Attorney/Party filing this form

**MEDIATION REQUESTED:** ☐ YES ☑ NO ☐ UNDECIDED

**Election to Proceed under the Alabama Rules for Expedited Civil Actions:** ☐ YES ☑ NO

ELECTRONICALLY FILED
1/7/2026 7:57 AM
09-CV-2026-900001.00
CIRCUIT COURT OF
BULLOCK COUNTY, ALABAMA
RASHAWN HARRIS, CLERK

IN THE CIRCUIT COURT OF
BULLOCK COUNTY, ALABAMA

JAMES HERBERT AYERS;
HENRY B. BAKER;
GREGORY MAURICE BANDY;
HENRY BASKIN;
GERNARDO LAMAR BLAKELY;
ELLA R BROWN;
HENRY CHARLES BROWN, JR.;
JASMINE JINAE BROWN;
JASON LEE CHRISTIAN;
FELICIA ANN COBB;
GLORIA D. COWAN;
JAWANNA QUINETTA CUNNINGHAM;
GARRETT LAMAR DAVIS;
JALAYDRIAN SHARAINE DELBRIDGE;
IVAN VAIL-DELGADO;
INNIS DUNCAN;
JACQUELYNN DENISE EFFORD;
ESSIE LEE ELLIS;
HELEN ELLIS
ELIZABETH JENKINS FITZPATRICK;
JEFFERY BERNARD FLINTROY
ETHEL BOWENS-FORD;
GLORIA DEAN FOSTER;
ELIZABETH GACHETTE;
ERIC A. HARRIS;
JAMES EARL HARRIS;
ERIC CENTER HENDERSON;
JACQUELINE DENISE HENDERSON;
EUNICE ELAINE BROWN HOOKS;
JEMMIE EARL HICKS, JR.;
ESSIE M. HILL;
FREDRICK JEROME HIX;
JEREMIAH CORNELIUS HOYLE;
ESTELLA S. HURT;
IDA M. HURT;
ENESTO LERNARD IVORY;

1

FELICIA MICHELLE JACKSON;
FRANCES ROSE JOHNSON;
JENIFFER R. KEY;
FREEMAN KENT KING;
GLORY KING;
EUGENE DEWAYNE LARKINS;
FREDRICK LAMAR LAWRENCE;
FANNIE BELL LOCKWOOD;
HANSON WEST MACK;
JADARRIAN DIONTA MACK;
ERIC ANTONIO MACON;
ERICA SHUNTALL MAHONE;
HELEN LOUISE MASON;
GLORIA D. MIDDLETON;
ELLA M. MILBRY;
ELVIS GREGORY MILES;
ESSER L. MILES;
JAMAR D. MORRIS;
JEFFERY TERRELL MURRAY;
ERIC L. O'NEAL;
ERICA L. O'NEAL;
ELVIN LEIGH O'NEAL;
HARVEY CORNELIUS PARKER;
JACQUELINE W PATTERSON;
EDRICK DEAUNDREA PEARSON;
IRVIN JEROME PUGH;
JAMES BILLY RAYBON;
JEMARIO DENZELL EDWARD RAYBON;
JELISSA MONTREAL ROBINSON;
ESTELLA ROSS;
FRAZIER LEE SCOTT, JR.;
GAZETTE JACKSON SCOTT;
HAROLD BERNARD SCOTT, JR.;
JEFFERY BRUCE SCOTT, JR.;
JEFFREY BRUCE SCOTT, SR.;
JAMES HERRON SHELL, JR.;
FREDDIE LEE SHELLEY;
JEFFERY LAMAR SIMMONS;
JARVIS SMART;
GLORIA BELL SMITH;

2

JANEKIA QUANTRAIL SMITH;
FORICESTEEN STREETER;
GEORGE WILLIS SURLES;
ETHEL JANE TARVER;
HUBBARD A. TARVER;
JACQUELINE SARMANE THOMPKINS;
EMILY ESTHER THOMPSON;
JAMILA SASHUN TOWNSEND;
HYTASHA TRABUE;
JA'JUANTAE MALIK TRABUE;
ELIJAH MARQUZ WALKER;
FARENZO WEATHINGTON;
JERALDINE R. WEAVER;
ERIC LAMAR WITHERSPOON,
    *Plaintiffs,*

    v.                           CIVIL ACTION NO. CV-

AGRI STATS, INC.;
PERDUE FARMS, INC.;                  COMPLAINT
PERDUE FOODS, LLC;
TYSON FOODS, INC., is successor to      Jury Trial Demand
KEYSTONE FOODS, LLC; EQUITY GROUP,
and CHAROEN PHOPKHAND;
PILGRIM'S PRIDE CORPORATION;
WAYNE FARMS, LLC;
WAYNE-SANDERSON FARMS, LLC,  the
successor entity resulting from the merger of
Sanderson Farms, Inc. and Wayne Farms, LLC;
CARGILL MEAT SOLUTIONS, INC.;
CONTINENTAL GRAIN COMPANY;
KOCH FOODS, INC.;
KOCH FOODS OF ALABAMA, LLC;
PECO FOODS, INC.;
FOSTER POULTRY FARMS, LLC;
Fictitious Defendant A-BB,
    *Defendants.*

3

## COMPLAINT

COME NOW the plaintiffs in the above styled cause and bring this action against the defendants, named and fictitious as says unto the Court as follows:

## INTRODUCTION

1. This action is brought to remedy a secret, multi-decade conspiracy orchestrated by America's largest poultry processing companies. While holding themselves out to the public as fierce competitors, these corporate giants privately colluded to systematically fix, depress, and stabilize the compensation paid to hundreds of thousands of their most vulnerable employees.

2. Through "off the books" meetings, illicit exchanges of competitively sensitive data facilitated by consulting firms, and direct plant-to-plant communications, the defendants formed an unlawful cartel to suppress labor costs and maximize their own profits. This conduct, which resulted in artificially depressed wages and benefits for the plaintiffs and other workers, constitutes a flagrant and ongoing violation of the laws of the State of Alabama.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over the claims asserted herein pursuant to the laws and Constitution of the State of Alabama.

2. Venue is proper in Bullock County, Alabama, pursuant to as one or more of the defendants transact or during the relevant time period transacted business within this jurisdiction, regularly, systemically and actively, and the wrongful acts and omissions alleged herein occurred in or had substantial effects within this county, including the plaintiffs.

3. The amount in controversy for each individual plaintiff is no more than $74,999.99 per Plaintiff.

## PARTIES

**Plaintiffs**

1. Plaintiff, JAMES HERBERT AYERS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants'

4

unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

2. Plaintiff, HENRY B. BAKER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

3. Plaintiff, GREGORY MARUICE BANDY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

4. Plaintiff, HENRY BASKIN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

5. Plaintiff, GERNARDO LAMAR BLAKELY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

6. Plaintiff, ELLA R. BROWN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

7. Plaintiff, HENRY CHARLES BROWN, JR., is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

5

8. Plaintiff, JASMINE JINAE BROWN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

9. Plaintiff, JASON LEE CHRISTIAN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

10. Plaintiff, FELICIA ANN COBB, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

11. Plaintiff, GLORIA D. COWAN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

12. Plaintiff, JAWANNA QUINETTA CUNNINGHAM, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

13. Plaintiff, GARRETT LAMAR DAVIS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

14. Plaintiff, JALAYDRIAN SHARAINE DELBRIDGE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or

6

more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

15. Plaintiff, IVAN VAIL-DELGADO, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

16. Plaintiff, INNIS DUNCAN, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

17. Plaintiff, JACQUELYNN DENISE EFFORD, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

18. Plaintiff, ESSIE LEE ELLIS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

19. Plaintiff, HELEN ELLIS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

20. Plaintiff, ELIZABETH JENKINS FITZPATRICK, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the

defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

21. Plaintiff, JEFFERY BERNARD FLINTROY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

22. Plaintiff, ETHEL BOWENS-FORD, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

23. Plaintiff, GLORIA DEAN FOSTER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

24. Plaintiff, ELIZABETH GACHETTE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

25. Plaintiff, ERIC A. HARRIS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

26. Plaintiff, JAMES EARL HARRIS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

27. Plaintiff, ERIC CENTER HENDERSON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

28. Plaintiff, JACQUELINE DENISE HENDERSON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

29. Plaintiff, EUNICE ELAINE BROWN HOOKS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

30. Plaintiff, JEMMIE EARL HICKS, JR., is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

31. Plaintiff, ESSIE M. HILL, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

32. Plaintiff, FREDRICK JEROME HIX, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

33. Plaintiff, JEREMIAH CORNELIUS HOYLE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of

9

the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

34. Plaintiff, ESTELLE S. HURT, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

35. Plaintiff, IDA M. HURT, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

36. Plaintiff, ENESTO LERNARD IVORY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

37. Plaintiff, FELICIA MICHELLE JACKSON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

38. Plaintiff, FRANCES ROSE JOHNSON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

39. Plaintiff, JENIFFER R. KEY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful

10

conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

40. Plaintiff, FREEMAN KENT KING, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

41. Plaintiff, GLORIA KING, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

42. Plaintiff, EUGENE DEWAYNE LARKINS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

43. Plaintiff, FREDRICK LAMAR LAWRENCE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

44. Plaintiff, FANNIE BELL LOCKWOOD, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

45. Plaintiff, HANSON WEST MACK, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

11

46. Plaintiff, JADARRIAN DIONTA MACK, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

47. Plaintiff, ERIC ANTONIO MACON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

48. Plaintiff, ERICA SHUNTALL MAHONE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

49. Plaintiff, HELEN LOUISE MASON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

50. Plaintiff, GLORIA D. MIDDLETON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

51. Plaintiff, ELLA M. MILBRY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

52. Plaintiff, ELVIS GREGORY MILES, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of

12

the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

53. Plaintiff, ESSER L. MILES, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

54. Plaintiff, JAMAR D. MORRIS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

55. Plaintiff, JEFFERY TERRELL MURRAY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

56. Plaintiff, ERIC L. O'NEAL, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

57. Plaintiff, ERICA L. O'NEAL, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

58. Plaintiff, ELVIN LEIGH O'NEAL, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful

conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

59. Plaintiff, HARVEY CORNELIUS PARKER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

60. Plaintiff, JACQUELINE W. PATTERSON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

61. Plaintiff, EDRICK DEAUNDREA PEARSON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

62. Plaintiff, IRVIN JEROME PUGH, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

63. Plaintiff, JAMES BILLY RAYBON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

64. Plaintiff, JEMARIO DENZELL EDWARD RAYBON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

14

65. Plaintiff, JELISSA MONTREAL ROBINSON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

66. Plaintiff, ESTELLA ROSS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

67. Plaintiff, FRAZIER LEE SCOTT, JR., is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

68. Plaintiff, GAZETTE JACKSON SCOTT, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

69. Plaintiff, HAROLD BERNARD SCOTT, JR., is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

70. Plaintiff, JEFFERY BRUCE SCOTT, JR., is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

71. Plaintiff, JEFFERY BRUCE SCOTT, SR., is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of

15

the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

72. Plaintiff, JAMES HERRON SHELL, JR., is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

73. Plaintiff, FREDDIE LEE SHELLEY, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

74. Plaintiff, JEFFERY LAMAR SIMMONS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

75. Plaintiff, JARVIS SMART, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

76. Plaintiff, GLORIA BELL SMITH, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

77. Plaintiff, JANEKIA QUANTRAIL SMITH, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants'

unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

78. Plaintiff, FORICESTEEN STREETER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

79. Plaintiff, GEORGE WILLIS SURLES, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

80. Plaintiff, ETHEL JANE TARVER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

81. Plaintiff, HUBBARD A. TARVER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

82. Plaintiff, JACQUELINE SARMANE THOMPKINS, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

83. Plaintiff, EMILY ESTHER THOMPSON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

17

84. Plaintiff, JAMILA SASHUN TOWNSEND, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

85. Plaintiff, HYTASHA TRABUE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

86. Plaintiff, JA'JUANTAE MALIK TRABUE, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

87. Plaintiff, ELIJAH MARQUZ WALKER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

88. Plaintiff, FARENZO WEATHINGTON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

89. Plaintiff, JERALDINE R. WEAVER, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

90. Plaintiff, ERIC LAMAR WITHERSPOON, is a citizen and resident of the State of Alabama. During the relevant period, Plaintiff was employed by one or more of

the defendant Processors. As a direct and proximate result of the defendants' unlawful conduct, they suffered economic damages in the form of suppressed wages and benefits, as well as severe emotional distress.

**Defendants**

1.  Agri Stats, Inc., is a foreign corporation that actively solicited, serviced and maintained business services and systemically and regularly conducts or conducted business in this jurisdiction, and these business activities directly relate to the damages to the plaintiffs alleged in this action. They actively solicited and maintained business relationships with Alabama-based companies, including co-conspirator defendants. They regularly visited the plants of the co-conspirator defendants in this jurisdiction and in Alabama. Agri Stats purposefully availed itself of the benefits and protections of the Alabama market. This was not passive conduct, but rather an active and continuous service provision involving data collection, auditing, and report dissemination to specific clients in the state and direct, physical presence through representatives in this jurisdiction. The harm to the Plaintiffs, receiving artificially depressed wages as a result of Agri Stats' services, contacts and participation in the conspiracy, occurred in Alabama and was directly related to Agri Stats' business activities within the state. Agri Stats provided a service that it knew or should have known directly and negatively impacted the compensation of a large workforce within this jurisdiction.

2.  Perdue Farms, Inc., Perdue Foods, LLC, (hereinafter collectively referred to as "Perdue" unless otherwise specified") is a foreign corporation that conducts or conducted business in this jurisdiction, purposefully availed itself to the laws, rights and protections of this jurisdiction, contacts within relate to the plaintiffs' claims, their contacts are such as Defendant should reasonably anticipate being subject to this court's jurisdiction.

3.  Keystone Foods, LLC, Equity Group, Charoen Phopkhand Foods all K/N/A Tyson Foods, Inc. (collectively referred to herein as "Tyson" unless otherwise specified) is a foreign corporation that conducts or conducted business in this jurisdiction during the relevant time period, purposefully availed itself to the laws, rights and protections of this jurisdiction, contacts within relate to the plaintiffs' claims, their contacts are such as defendant should reasonably anticipate being subject to this court's jurisdiction.

19

4. Pilgrim's Pride Corporation, is a foreign corporation that conducts or conducted business in this jurisdiction, purposefully availed itself to the laws, rights and protections of this jurisdiction, contacts within relate to the plaintiffs' claims, their contacts are such as Defendant should reasonably anticipate being subject to this court's jurisdiction.

5. Wayne Farms LLC, Wayne-Sanderson Farms LLC, Sanderson Farms, Inc., (hereinafter collectively referred to as "Sanderson" unless otherwise specified) is a foreign corporation that conducts or conducted business in this jurisdiction, purposefully availed itself to the laws, rights and protections of this jurisdiction, contacts within relate to the plaintiffs' claims, their contacts are such as Defendant should reasonably anticipate being subject to this court's jurisdiction.

6. Cargill Meat Solutions Corporation and Continental Grain Company are foreign corporations that jointly entered into a venture to operate Wayne-Sanderson Farms LLC. Wayne-Sanderson Farms LLC is a foreign limited liability company formed through the merger of Sanderson Farms, Inc. and Wayne Farms LLC. Each of these entities conducts or conducted business in this jurisdiction, has purposefully availed itself of the laws, rights, and protections of the State of Alabama, and has maintained contacts within this forum that directly relate to the Plaintiffs' claims. Their business activities in Alabama are such that they should reasonably anticipate being subject to the jurisdiction of this Court.

7. Koch Foods, Inc., is a foreign corporation that conducts or conducted business in this jurisdiction, purposefully availed itself to the laws, rights and protections of this jurisdiction, and their contacts within this jurisdiction relate to the plaintiffs' claims, their contacts are such as Defendant should reasonably anticipate being subject to this court's jurisdiction.

8. Koch Foods of Alabama, LLC is a limited liability company that conducts or conducted business in this jurisdiction as an operating affiliate and agent of Koch Foods, Inc., (collectively referred to herein as "Koch" unless otherwise specified) purposefully availed itself to the laws, rights and protections of this jurisdiction, and their contacts within this jurisdiction relate to the plaintiffs' claims, their contacts are such as Defendant should reasonably anticipate being subject to this court's jurisdiction.

20

9. Peco Foods, Inc., is a privately held Alabama corporation that conducts or conducted business in Alabama, purposefully availed itself to the laws, rights and protections of this jurisdiction, and their contacts within this jurisdiction relate to the plaintiffs' claims, their contacts are such as Defendant should reasonably anticipate being subject to this court's jurisdiction.

10. Foster Poultry Farms, LLC is a foreign limited liability company that conducts or conducted business in this jurisdiction during the relevant time period, purposefully availed itself to the laws, rights and protections of this jurisdiction, and their contacts within this jurisdiction relate to the plaintiffs' claims, their contacts are such as Defendant should reasonably anticipate being subject to this court's jurisdiction.

11. Fictitious defendants A-G, whether singular or plural, is that person, firm, corporation or entity that was responsible for the defendants' payroll, human resources, accounting and decisions on the setting of employee wages and benefits.

12. Fictitious defendants H-N, whether singular or plural, is that person, firm, corporation or entity that managed, supervised and/or controlled the day-to-day business dealings of the defendant producers' facility at which the plaintiff(s) were employed during the time period relevant to the allegations in this action.

13. Fictitious defendants O-U, whether singular or plural, is that entity or those entities, that individual or those individuals, other than those described above, whose negligence, wantonness, intentional conduct, willfulness, fraud, conspiracy, complicity or other wrongful conduct contributed to the cause of the occurrence made the basis of Plaintiffs' Complaint.

14. Fictitious defendants V-BB, whether singular or plural, are those entities which are the predecessors or successors-in-interest to any of those entities or individuals described above and herein.

## FACTUAL ALLEGATIONS

1. Defendants, named and fictitious, participated in a multi-decade conspiracy among the nation's dominant poultry processors including the defendant processors. The purpose of this conspiracy was to eliminate competition for labor by artificially suppressing the compensation of hundreds of thousands of poultry

workers, including the plaintiffs, to levels materially below what would have prevailed in a competitive market.

2. Agri Stats, Inc., is a foreign corporation that actively and directly solicited, serviced and maintained business services and systemically and regularly conducts or conducted business and provided their services in this jurisdiction, including the regular visits by Agri Stats representatives to co-conspirator defendant processing plants of defendant processors in this jurisdiction, and these business activities directly relate to the damages to the plaintiffs alleged in this action. Agri Stats established substantial ongoing contractual relationships involving physical presence in Alabama and engaged in continuing business relationships with the co-conspirator defendant processors which employed the plaintiffs and they knew or should have known these direct contacts would impact plaintiffs and those similarly situated.

3. Perdue Farms, Inc. and Perdue Foods LLC (collectively "Perdue") are integrated poultry processors with headquarters in Salisbury, Maryland. Perdue operates, or during the relevant time period operated poultry facilities across the United States including in this jurisdiction. Perdue is, or was, a central and long-standing participant in the conspiracy with co-Defendants to depress and fix wages of Plaintiffs.

4. Tyson is among the world's largest processors of chicken, beef, and pork, with headquarters in Springdale, Arkansas. Tyson operates poultry facilities throughout the United States including in this jurisdiction during the relevant time period. Tyson is, or was, a central and long-standing participant in the conspiracy with co-defendants to depress and fix wages of Plaintiffs.

5. Pilgrim's Pride Corporation ("Pilgrim's") is a major poultry processor headquartered in Greeley, Colorado. Pilgrim's operates poultry facilities across the United States including in Alabama. Pilgrim's is, or was, a core member of the conspiracy, actively participating in the annual meetings and using exchanged data from co-conspirator Agri Stats as a direct mechanism for setting and suppressing employee wages.

6. Sanderson Farms, Inc. ("Sanderson") is a poultry processor headquartered in Laurel, Mississippi. Sanderson Farms is, or was, a central and long-standing

22

participant in the conspiracy with co-defendants to depress and fix wages of Plaintiffs.

7. Charoen Phopkhand Foods is a Thailand-based agro-industrial and food conglomerate and a co-conspirator with co-defendants to depress and fix wages of Plaintiffs. They operated poultry facilities across the United States including in this jurisdiction during the relevant time period. Additionally, in 2004, CP Foods sold its U.S. chicken-processing assets in Alabama.  The integrated chicken business and substantial assets of Charoen Pokphand (USA) in Alabama were sold to Equity Group Eufaula Division, LLC.

8. Koch Foods, Inc. is a poultry processor headquartered in Park Ridge, Illinois. Koch operates poultry facilities across the United States including in this jurisdiction Koch Foods is one of the largest vertically integrated poultry processors in the United States and conducts substantial business nationwide, including through wholly owned and controlled operating subsidiaries in the State of Alabama. Koch is alleged to have been a consistent participant in the conspiracy with co-defendants to depress and fix wages of Plaintiffs.

9. Koch Foods of Alabama, LLC is an operating affiliate and agent of Koch Foods, Inc., who is a poultry processor operation in the United States and conducts substantial business nationwide, including through wholly owned and controlled operating subsidiaries in the State of Alabama, including this jurisdiction.

10. Peco Foods Inc. is an Alabama-based poultry processor headquartered in Tuscaloosa, Alabama. Peco Foods Inc. is, or was, a central and long-standing participant in the conspiracy with co-defendants to depress and fix wages of Plaintiffs.

11. Foster Poultry Farms, LLC poultry processor headquartered in Livingston, California. Foster Poultry Farms is, or was, a central and long-standing participant in the conspiracy with co-defendants to depress and fix wages of Plaintiffs.

12. Fictitious defendants A-G, whether singular or plural, is that person, firm, corporation or entity that was responsible for the defendants' payroll, human resources, accounting and decisions on the setting of employee wages and benefits.

13. Fictitious defendants H-N, whether singular or plural, is that person, firm, corporation or entity that managed, supervised and/or controlled the day-to-day business dealings of the defendant producers' facility at which the plaintiff(s) were employed during the time period relevant to the allegations in this action.

14. Fictitious defendants O-U, whether singular or plural, is that entity or those entities, that individual or those individuals, other than those described above, whose negligence, wantonness, intentional conduct, willfulness, fraud, conspiracy, complicity or other wrongful conduct contributed to the cause of the occurrence made the basis of Plaintiff's Complaint.

15. Fictitious defendants V-BB, whether singular or plural, are those entities which are the predecessors or successors-in-interest to any of those entities or individuals described above and herein.

16. The Individual HR and Plant Manager defendants are individuals whose identities are not yet fully known but who served as agents and employees of the defendant Processors. At all relevant times, these individuals acted within the line and scope of their employment. Their wrongful acts, including the direct exchange of competitively sensitive wage data with rival plants, were calculated to and did benefit their corporate employers by reducing labor costs. This conduct was known to, authorized by, and subsequently ratified by their respective employers.

17. All defendants, named and fictitious, participated in the same wage-fixing information exchange that directly suppressed wages paid to the plaintiffs causing damages.

18. All defendant producers, named and fictitious, subscribed to Agri Stats / WMS and attended meetings knowing Alabama plants and jobs were in the data set and that benchmark targets would be applied to Alabama wages causing damages to the plaintiffs and those similarly situated in this jurisdiction.

## A. The Poultry Processing Industry and its Susceptibility to Collusion

1. The poultry processing industry possesses numerous structural characteristics, that make it uniquely susceptible to the type of long-running, collusive scheme alleged herein. These factors created an environment where the conspiracy could not only form but thrive for decades.

2. The defendant processors collectively control the majority of the U.S. poultry market. This high concentration limits the number of independent competitors, magnifies the conspirators' collective market power over labor, and simplifies the process of coordinating and policing a collusive agreement.

3. The cost of establishing a new, vertically integrated poultry processing complex, upon information and belief, exceeds $100 million. This immense capital requirement effectively prevents new competitors from entering the market to challenge the incumbents and disrupt their collusive arrangement.

4. Workers performing similar production and maintenance roles at different processing plants are largely interchangeable. This fungibility of labor makes it simple for competitors to compare and align compensation for any given position across the industry.

5. The workforce in poultry processing is disproportionately comprised of vulnerable populations, including marginalized citizens, immigrants, refugees, and asylum-seekers with limited English proficiency, education, and alternative employment options. This creates a captive labor pool that cannot easily respond to suppressed wages by seeking work elsewhere, allowing the defendants to depress compensation without fear of losing their workforce.

**B. The Decades-Long Conspiracy to Suppress Employee Compensation**

1. Upon information and belief, beginning as early as January 1, 2000, and continuing until at least July 20, 2021, the defendant Processors and their co-conspirators entered into a continuing contract, combination, and conspiracy to illegally fix, depress, maintain, and stabilize the compensation paid to their employees, including the plaintiffs, resulting in damage to plaintiffs.

2. The primary motivation for this conspiracy was to reduce labor costs—a substantial portion of each processor's operating expenses—and thereby maximize corporate profits at the direct expense of their employees. To facilitate this scheme, compensation decisions were centralized at the corporate headquarters of each defendant Processor rather than being made at the local plant level.

## C. The Mechanics of the Unlawful Conspiracy

1. Defendant Producers did not passively receive WMS reports. Instead, competing processors formed a Poultry Industry Survey Group that collectively controlled the survey's scope, questions, participating companies, and the level of detail contained in results. A small Steering Committee of processor executives made the key decisions and met privately so that Defendants could speak candidly about compensation practices and align pay without oversight. WMS distributed survey results immediately before annual in-person compensation meetings, after which Defendants held private roundtables to coordinate how to apply the benchmarks to real-world pay decisions, including at Alabama plants.

2. The defendants executed their conspiracy through a sophisticated, multi-pronged strategy involving secretive in-person meetings, illicit information exchanges managed by third-party consultants, and direct communications between competitors.

3. A core component of the conspiracy was a series of annual in-person meetings of senior human resources and compensation executives from the competing defendant Processors.

4. These meetings were, upon information and belief, organized by a committee led by executives from defendants Tyson and Perdue, among others. Upon information and belief, these meetings were intentionally kept "off the books" to avoid creating a paper trail.

5. Upon information and belief these meetings, and the information shared, was/were to kept confidential.

6. During hours-long, private roundtable sessions executives from the defendants and others discussed survey results, agreed upon compensation rates for the coming year and chastised any processor that had deviated from previously fixed pay levels.

7. Webber, Meng, Sahl and Company, Inc. (WMS): WMS was hired to provide data to the producers under the guise of abiding by applicable regulations. WMS unwittingly provided the infrastructure for the conspiracy under a "veneer of legality." Its president, Jonathan Meng, repeatedly warned the defendant

26

Processors that their practice of exchanging future, disaggregated compensation data violated the applicable laws. Despite these warnings, WMS, at the direction of the processors, designed surveys to collect this data, resulting in sham anonymization, and its representatives were excluded from private "roundtable sessions" where illicit and conspiratorial agreements were being made.

8.  The survey's framework was used as a pretext to hide Defendants' conspiracy from employees and the public. By routing their wage exchanges through WMS while dictating unlawful levels of detail and future-looking content, Defendants concealed material facts: that they were no longer competing for labor in Alabama and were instead jointly suppressing compensation. This concealment and coordinated conduct form part of the fraudulent scheme, civil conspiracy, and unjust enrichment described in this Complaint.

**2. Illicit Information Exchanges Facilitated by Agri Stats**

1.  **Webber, Meng, Sahl & Co. (WMS)** was hired to administer an annual "Poultry Industry Compensation Survey," providing a veil of legality to the information exchange.

    a.  The survey was designed by the processors' Steering Committee to collect detailed data on wages, salaries, and benefits. Crucially, against the repeated warnings of WMS President Jonathan Meng the survey collected future compensation data, including planned salary increases and their timing.

    b.  Mr. Meng ultimately concluded that the processors hired WMS to "create an appearance of compliance" while they "continued to exchange disaggregated and deanonymized compensation data and continued to discuss and harmonize their compensation practices."

2.  The survey employed an anonymization technique, replacing company names with letter codes. However, the reports contained such granular detail (e.g., plant locations, employee counts) that participants, Defendants, could easily identify their specific competitors. A former Perdue employee confirmed this, stating it was easy when "you're sitting in a meeting and the person across from you [from a competing processor] is reporting on what they do."

27

3. **Agri Stats, Inc.** provided the mechanism for continuous monitoring and enforcement of the conspiracy.

   a. Agri Stats collected and distributed monthly reports containing terabytes of detailed, current, non-public, and plant-specific compensation data from over 95% of U.S. poultry processors.

   b. Agri Stats collected non-public, confidential, and proprietary wage and compensation data from competing poultry processors and redistributed that data among the processors on a monthly basis, including current hourly wages and salaries broken down by plant and job position. This data was not publicly available and could only be accessed by processors that reciprocated by submitting their own detailed compensation information, thereby enabling coordinated wage decision-making among competitors.

   c. Agri Stats falsely represented that its compensation reports were anonymized or aggregated, while knowingly distributing highly granular, disaggregated data that processors could and did reverse-engineer to identify which competitors and which specific plants corresponded to particular wage figures. This sham anonymization concealed the true nature of the inter-company wage exchange while allowing processors to coordinate compensation with precision.

   d. Despite claims of anonymity, the data was easily decodable. A former Perdue employee stated the anonymity claim was "just bullshit" and that every participating processor "knew precisely which company reported which data."

   e. The monthly frequency of the reports allowed defendants to ensure no co-conspirator broke ranks by raising wages. A former Butterball executive confirmed there was "no question about it" that Agri Stats was used by processors to "monitor each other's performance." The crucial role of this data is underscored by the public statement of Joe Sanderson, then-CEO of Sanderson Farms, that "we live and die by Agri Stats."

   f. Agri Stats travelled between each Defendant Processor regularly and discussed the nonpublic, proprietary data at those meetings, including but not limited to quarterly in-person meetings with each processor's

executives, involving travel between producers and discussion of non-public data.

g. Agri Stats representatives physically visited each co-conspirator defendant processor plant, conducting on-site meetings lasting at least one week to establish data-collection processes, identify internal payroll data sources, and standardize reporting formats. These visits embedded Agri Stats directly inside processor operations and facilitated the ongoing exchange of sensitive wage information.

h. Agri Stats employees and representatives assisted poultry processors in interpreting and decoding Agri Stats reports, including by explaining how to determine which competitor submitted specific compensation data. Agri Stats personnel trained processor management on how to extract competitive intelligence from the reports, further enabling coordinated wage suppression.

i. Agri Stats audited the raw wage data submitted by processors to ensure accuracy and consistency, which ensured that no processor could deviate from agreed-upon compensation levels by secretly paying higher wages. These audits functioned as a policing and enforcement mechanism, reinforcing adherence to coordinated wage suppression.

j. Through the monthly dissemination of current wage data, Agri Stats enabled co-conspirator defendant processors to continuously monitor each other's compensation levels and detect deviations in near real time. This continuous monitoring reduced competitive uncertainty and stabilized wages across processors.

k. Agri Stats data was reviewed at individual poultry processing plants, not merely at corporate headquarters. Corporate officers and plant managers used Agri Stats benchmarks to compare plant wages against competitors and ensure that wages remained within coordinated ranges. Agri State corporate personnel were tasked with visiting plants to ensure wages stayed precisely aligned with Agri Stats benchmarks.

l. Agri Stats' reports were not sold to the public, employees, or unions. Agri Stats concealed the existence and mechanics of coordinated wage suppression from workers.

m. Because Agri Stats regularly travelled between processors, discussed proprietary wage data with each, and audited their submissions, it acted as a central hub connecting competing employers and transmitting information that allowed the conspiracy to function, persist, and remain concealed.

n. Each of the foregoing acts was intentional, knowing, and undertaken in furtherance of a common scheme to suppress and stabilize wages. Agri Stats knew that the compensation data it collected, analyzed, audited, and redistributed would be used by competing poultry processors to coordinate wage decisions, and Agri Stats substantially assisted that scheme through repeated, affirmative conduct resulting in harm to plaintiffs.

**3. Direct Plant-to-Plant Communications**

1. The conspiracy was furthered by frequent, direct communications between managers at competing plants. Plant managers and human resources personnel regularly contacted their counterparts at nearby rival facilities to request and exchange current and future wage and benefit information.

2. A former human resources manager who worked for both Perdue and George's admitted to this practice, stating, "We would collaborate. We would talk among each other to see what they were doing for pay."

**D. Fraudulent Concealment of the Conspiracy**

1. The defendants took active and deliberate steps to fraudulently conceal their unlawful conduct from their employees and the public. These steps included:

a. Holding secret, "off the books" meetings and requiring in-person attendance to avoid a paper trail.

b. Using third-party consultants and sham data anonymization techniques to create a facade of legality for their illicit information exchanges.

    c. Making false and misleading public statements on company websites and in advertisements claiming they paid "competitive wages," all while actively conspiring to suppress those same wages.

2. Following increased scrutiny, including the filing of a separate price-fixing lawsuit in 2016, several defendant Processors abruptly withdrew from the WMS survey, citing the "advice of legal counsel." This change in behavior is compelling evidence of the defendants' consciousness of guilt.

## E. Harm to the Plaintiffs

1. The direct and intended result of the defendants' conspiracy was the artificial suppression of worker compensation. While worker productivity skyrocketed with processing line speeds increasing by 54% between 1999 and 2015 the real-world earnings of those workers plummeted. During that same period, inflation-adjusted hourly wages for poultry processing workers *decreased* by more than 1%.

2. The small annual raises that workers did receive were often entirely offset by corresponding increases in health insurance premiums. As a direct result of the conspiracy, the plaintiffs and other similarly situated workers were paid materially less than they would have been in a competitive market, which systematically transferred wealth from the plaintiffs and the class to the defendants in the form of artificially inflated corporate profits.

## F. Specific Allegations Against Each Defendant

1. **The Perdue Defendants:** Perdue was a central and long-standing participant in the conspiracy. Its employees attended every annual compensation meeting between 2001 and 2019, submitted detailed compensation data to WMS every year from 2000 to 2019, and subscribed to Agri Stats. A former Perdue employee described the company's CEO as an "Agri Stats guru" and stated that Perdue managers regularly collaborated with rivals to exchange wage information.

2. Perdue employees knew that compensation data submitted through WMS was readily attributable to specific companies and plants, particularly during in-person meetings where competitors discussed their own reported data. A former Perdue employee explained that the source of compensation figures was obvious because

"you're sitting in a meeting and the person across from you is reporting on what they do."

3. Upon information and belief, Perdue used the Agri-Stats data to incorporate and monitor the conspiracy to suppress wages and ensure compliance by all defendants with the conspiracy.

4. Perdue subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors including co-conspirator defendants on a monthly basis.

5. Perdue regularly attended the annual meetings of co-conspirator defendants and obtained and exchanged competing processors information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels.

6. Perdue submitted data to the annual WMS survey during multiple years and subscribed to Agri Stats to exchange plant-specific compensation data on a monthly basis.

7. Perdue regularly exchanged current and future wages with managers from co-conspirator defendants and any planned future wage increases.

8. Perdue brought Agri Stats personnel into the company to train management on how to extract and interpret competitor-specific wage information from Agri Stats reports, despite the nominal claim that the data was anonymous.

9. Perdue employees reviewed disaggregated Agri Stats wage data during meetings held at Perdue poultry processing plants, using competitor comparisons to guide wage decisions at individual facilities rather than responding to local labor market forces.

10. Perdue and other co-conspirator defendants continued to reveal and discuss their specific compensation practices, future compensation plans, and target wage levels "behind closed doors", even after being warned that such conduct was inconsistent with lawful compensation benchmarking.

11. Perdue's knowing participation in repeated data exchanges, secret meetings, and direct communications predictably suppressed wages and benefits paid to poultry

processing workers, transferring economic value from workers to Perdue in the form of reduced labor costs and increased profits.

12. Each of the foregoing acts was intentional, knowing, and undertaken in concert with other co-conspirator defendants pursuant to a common plan to suppress employee compensation. Perdue knowingly joined and materially advanced a coordinated scheme that foreseeably caused economic harm to poultry workers, including Plaintiffs, and unjustly enriched Perdue at the expense of plaintiffs and those similarly situated.

13. **The Tyson Defendants:** Tyson was a leader of the conspiracy, serving on the Steering Committee that directed the WMS surveys. A Tyson Vice President of Compensation admitted in a 2015 email that "hourly production projected budgets" were "typically a discussion item" at the secret meetings. From 2013 to 2015, Tyson single-handedly paid WMS to conduct an even more granular survey to facilitate the exchange of raw, plant-level data, despite WMS's warnings that this violated the applicable law.

14. Tyson subscribed to Agri Stats and used it to exchange current, disaggregated, readily decodable, plant-specific compensation data with competing poultry processors on a monthly basis.

15. Tyson relied on Agri Stats reports to compare its wages to competitors and to keep its compensation within coordinated ranges rather than responding independently to labor market conditions.

16. Tyson employees and executives regularly attended secret, off-the-books Poultry Industry Compensation Committee meetings, including meetings held at the Hilton Sandestin Resort in Destin, Florida, where competing poultry processors exchanged non-public compensation information and discussed wages and benefits. These meetings were intentionally conducted outside normal reporting channels and without transparency to employees, and they facilitated coordinated wage decisions rather than independent competition.

17. Tyson was represented on the Steering Committee that controlled the structure, scope, and content of the WMS poultry compensation surveys for most of the relevant period. Through this role, Tyson participated in decisions to expand the surveys beyond generalized averages and to require more granular, plant-level,

33

and job-specific compensation information, increasing the usefulness of the surveys for coordinating wages rather than benchmarking competitively.

18. Tyson initiated, designed, and funded a supplemental compensation survey that collected raw, disaggregated, plant-level wage data for production, maintenance, and refrigeration workers. Tyson requested this survey despite warnings that its format violated accepted safeguards and facilitated identification of individual companies' and plants' wage data. Tyson paid for the survey, dictated its structure, and caused its results to be distributed to participating processors.

19. Tyson employees recruited other poultry processors to participate in the Tyson-sponsored survey and encouraged their submission of detailed wage data. Participants proceeded despite express warnings that the survey format defeated anonymity and allowed compensation data to be traced back to specific companies and plants.

20. Tyson regularly attended the annual meetings of co-conspirator defendants and obtained and exchanged competing processors information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels.

21. In advance of and for use at these secret compensation meetings, Tyson employees submitted highly detailed current and future compensation data to WMS, knowing and intending that the data would be distributed to, reviewed by, and discussed among competing poultry processors. Tyson made these submissions repeatedly over multiple years as part of the same coordinated scheme.

22. Tyson submitted data to the annual WMS survey during multiple years and subscribed to Agri Stats to exchange plant-specific compensation data on a monthly basis.

23. Tyson submitted highly detailed current compensation data to WMS in advance of meetings, knowing/expecting it would be distributed to and examined by competitors including co-conspirator defendants.

24. Tyson regularly exchanged current and future wages with managers from co-conspirator defendants and any planned future wage increases.

25. Tyson set compensation schedules and paid workers at "artificially depressed, wage fixed rates.

26. Tyson employees directly communicated with human-resources managers at competing poultry plants, including co-conspirator defendants to exchange current and future wage rates, including planned increases. These bilateral exchanges further reduced competition for labor and reinforced coordinated wage suppression.

27. As a result of this conduct, Tyson established compensation schedules and paid poultry workers' wages and benefits that were artificially suppressed and stabilized, rather than competitively determined. Tyson retained the financial benefit of reduced labor costs while workers bore the harm of depressed compensation resulting in damages to plaintiffs.

28. **Pilgrim's Pride Corporation:** Pilgrim's Pride was a core member of the conspiracy. A former employee stated that the company explicitly used Agri Stats data to set wages with the goal of paying "exactly in the middle" of the reported industry average. Its executives also requested that plant managers obtain current and future compensation information directly from competitors.

29. Pilgrim's subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

30. Pilgrim's regularly attended the annual meetings of co-conspirator defendants and obtained and exchanged competing processors information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels. In 2017, Pilgrim's withdrew from the annual meeting on the advice of counsel, demonstrating consciousness of its illegal conduct. However, they resumed participation in these meetings in 2018 and 2019.

31. Pilgrim's employees submitted detailed compensation data to WIMS for inclusion in the annual Poultry Industry Compensation Surveys. Pilgrim's knew and intended that this data, including current wages and planned future increases, would be distributed to and reviewed by competing processors during compensation meetings and related discussions.

32. Pilgrim's was among the co-conspirator defendants that controlled and influenced the design and operation of the WMS surveys, including decisions to collect granular, plant-level and job-specific compensation data. Pilgrim's participated in

surveys structured in a manner that allowed competitors, including co-conspirator defendants, to identify and compare each other's compensation practices.

33. Pilgrim's regularly exchanged current and future wages with managers from co-conspirator defendants and any planned future wage increases.

34. Pilgrim's used Agri Stats data at both corporate and plant levels, reviewing competitor compensation benchmarks to ensure that wages paid at individual Pilgrim's facilities remained aligned with industry benchmarks. Corporate personnel reviewed Agri Stats data with plant management to guide wage decisions.

35. In addition to survey-based exchanges, Pilgrim's Pride employees directly exchanged current and future wage information with employees of competing poultry processors. For example, Pilgrim's personnel exchanged wage information with Tyson employees regarding planned wage rates at specific plants, reducing uncertainty and reinforcing coordinated wage practices.

36. According to WMS President Jonathan Meng, Pilgrim's and other processors continued to discuss specific compensation practices, future wage plans, and target pay levels "behind closed doors", even after warnings that such exchanges were inconsistent with lawful benchmarking practices. Pilgrim's nevertheless continued participating in the surveys and meetings.

37. Pilgrim's established compensation schedules using survey results and Agri Stats benchmarks to align wages across its poultry processing facilities, rather than allowing wages to be determined by local labor supply and demand.

38. Through its participation in repeated data exchanges, secret meetings, and direct communications, Pilgrim's paid poultry processing workers, including the plaintiffs, wages and benefits that were suppressed and stabilized, transferring economic value from workers to Pilgrim's in the form of reduced labor costs.

39. Pilgrim's operated poultry processing facilities employing workers in Alabama and implemented compensation practices at those Alabama facilities that were informed by and aligned with the coordinated benchmarks and exchanges described above. These acts were directed at and caused harm to Alabama workers, including Plaintiffs.

36

40. Each of the foregoing acts was intentional, knowing, and undertaken in concert with others. Pilgrim's knowingly participated in a coordinated course of conduct that foreseeably suppressed employee compensation and unjustly enriched Pilgrim's at the expense of poultry processing workers, including Plaintiffs.

41. **Sanderson Farms, Inc.:** Sanderson subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

42. Sanderson employees submitted detailed compensation data to WMS for use in the annual Poultry Industry Compensation Survey, with the understanding that the data would be shared with and reviewed by competing processors at the compensation meetings including co-conspirator defendant processors. This included current wage information used to benchmark and align compensation across companies.

43. Sanderson Farms participated in surveys that were structured to allow competitors, including co-conspirator defendant processors, to identify the source of compensation data, including through granular plant-level details. Survey participants, including Sanderson Farms, reviewed compensation information in formats that allowed executives to match wage figures to specific competing companies and facilities including co-conspirator defendant processors.

44. Sanderson regularly attended the annual meetings of co-conspirator defendants and obtained and exchanged competing processors information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels.

45. Sanderson Farms was deeply integrated into the conspiracy, with its then-CEO publicly stating, "we live and die by Agri Stats." Like other conspirators, Sanderson Farms attended the secret annual meetings before withdrawing from the WMS survey group in 2012, informing other members that it was doing so "On the advice of legal counsel."

46. Following Sanderson Farms' merger with Wayne Farms, the resulting Wayne-Sanderson entity continued poultry processing operations using compensation structures informed by industry benchmarking practices, including Agri Stats data, thereby perpetuating the effects of the coordinated wage-setting scheme.

47. Through the foregoing conduct, Sanderson Farms paid poultry processing workers, including plaintiffs, wages that were suppressed and stabilized, transferring economic value from workers to Sanderson in the form of reduced labor costs and increased profitability.

48. Each of the foregoing acts was intentional, coordinated, and undertaken in concert with others. Sanderson Farms knowingly participated in a shared course of conduct that predictably suppressed employee compensation and unjustly benefited Sanderson at the expense of poultry processing workers, including Plaintiffs.

49. **The Koch Defendants:** (Koch Foods, Inc. & Koch Foods of Alabama, LLC) was a consistent participant, with its employees attending many of the annual compensation meetings. The company submitted data to the annual WMS survey during multiple years and subscribed to Agri Stats to exchange plant-specific compensation data on a monthly basis.

50. Koch subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

51. Koch relied on Agri Stats reports to compare its wages against competitors and to guide compensation decisions, rather than determining wages independently based on local labor conditions.

52. The Koch Defendants used Agri Stats wage benchmarks at both corporate and plant levels, reviewing competitor compensation data with plant management to ensure that wages at Koch facilities remained aligned with industry benchmarks. These practices replaced independent wage setting with coordinated benchmarking.

53. Koch regularly attended the annual meetings of co-conspirator defendants and obtained and exchanged competing processors information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels.

54. In addition to survey-based exchanges, the Koch Defendant employees directly exchanged current and future wage information with employees of competing poultry processors, including discussions of wage levels and timing of wage

38

DOCUMENT 2

increases. These communications reduced uncertainty and reinforced coordinated compensation practices.

55. Koch submitted data to the annual WMS survey during multiple years and subscribed to Agri Stats to exchange plant-specific compensation data on a monthly basis.

56. Through its participation in repeated data exchanges, secret meetings, and direct communications, Koch Foods paid poultry processing workers wages and benefits that were suppressed and stabilized, transferring economic value from workers to Koch in the form of reduced labor costs and increased profitability.

57. The Koch Defendants operated poultry processing facilities and related operations employing workers in Alabama and implemented compensation practices at those Alabama facilities that were informed by and aligned with the coordinated benchmarks and exchanges described above. These acts were directed at and caused harm to workers in this jurisdiction, including Plaintiffs.

58. Each of the foregoing acts was intentional, knowing, and undertaken in concert with others. The Koch Defendants knowingly joined and materially advanced a coordinated scheme that foreseeably suppressed employee compensation and unjustly enriched Koch at the expense of poultry processing workers, including Plaintiffs.

59. **Agri Stats, Inc.:** Agri Stats was the central monitoring and enforcement arm of the conspiracy as previously stated herein. It collected and distributed detailed, non-public, and readily decodable compensation data on a monthly basis. A former Perdue employee stated Agri Stats was responsible for "collusion in the poultry industry," and by admission of a former producer, confirmed that Agri Stats was used to monitor each other's performance. Agri Stats profited handsomely from its role, charging each processor substantial fees.

60. Agri Stats embedded itself within processor operations, repeatedly collected and audited non-public compensation data, traveled between competitors to discuss that data, trained processor personnel to interpret and apply competitor wage information, and redistributed detailed benchmarking reports that were used to guide actual wage decisions.

61. Agri Stats knew that its conduct would be used to align compensation practices rather than foster independent decision-making, and it continued that conduct despite the foreseeable and intended effect of depressing wages paid to poultry processing workers, including Plaintiffs. By doing so, Agri Stats materially advanced and concealed the conspiracy, causing direct harm to workers in this jurisdiction including the plaintiffs and unjustly enriching itself and the participating processors.

62. Agri Stats was not a passive service provider. It designed, executed, and enforced the information exchanges that allowed competing poultry processors to coordinate compensation practices while concealing that coordination from workers, including the plaintiffs. Through repeated affirmative acts, Agri Stats knowingly facilitated conduct that predictably suppressed wages and caused economic harm to Plaintiffs.

63. Through the foregoing acts, Agri Stats knowingly and substantially assisted in a coordinated scheme among competing poultry processors to suppress and stabilize employee compensation.

64. **Cargill Meat Solutions:** Cargill employees attended regular annual meetings, and every annual meeting between 2001 and 2019 where executives from competing poultry processors gathered to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of the plaintiffs and those similarly situated at artificially depressed levels.

65. Cargill submitted data to the annual WMS survey during multiple years and subscribed to Agri Stats to exchange plant-specific compensation data on a monthly basis.

66. Cargill exchanged current and future wages with managers of co-conspirator defendants and any planned future wage increases.

67. Cargill and other processors, including co-conspirator defendants, continued to reveal and discuss specific compensation practices, future wage plans, and target pay levels behind closed doors, even after being warned that such exchanges posed legal risks and were inconsistent with lawful benchmarking safeguards.

40

68. Through the foregoing conduct, Sanderson Farms paid poultry processing workers, including plaintiffs, wages that were suppressed and stabilized, transferring economic value from workers to Sanderson in the form of reduced labor costs and increased profitability.

69. Cargill operated poultry processing facilities and related operations employing workers in Alabama and implemented compensation practices at those Alabama facilities that were informed by and aligned with the coordinated benchmarks and exchanges described above. These acts were directed at and caused harm to Alabama workers, including Plaintiffs.

70. Each of the foregoing acts was intentional, knowing, and undertaken in concert with others. Cargill knowingly joined and materially advanced a coordinated scheme that foreseeably suppressed employee compensation and unjustly enriched Cargill at the expense of poultry processing workers, including Plaintiffs.

71. **Fictitious Defendants A-BB:** The individual John and Jane Doe defendants, including but not limited to HR and Plant Managers, successors, were the agents who carried out the conspiracy on the ground. Acting within the scope of their employment and at the direction of their corporate superiors, they engaged in regular bilateral exchanges of current and future wage information with managers at rival plants. These acts directly furthered the conspiracy and benefited their employers by ensuring local pay rates remained aligned and suppressed.

72. The foregoing factual allegations give rise to the following legal claims for relief.

## CAUSES OF ACTION
### COUNT I: FRAUD & FRAUDULENT CONCEALMENT (Against All defendants)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. Under Alabama law, a claim for fraudulent concealment is established by showing (1) a duty on the part of the defendant to disclose a material fact; (2) concealment or nondisclosure of that fact; (3) inducement of the plaintiff to act; and (4) action by the plaintiff to his or her injury. *Chiepalich v. Chiepalich*, 392 So. 3d 467 (Ala. 2023); APJI 16.05.

41

3. Defendants had a duty to disclose to their employees, the plaintiffs, the existence of a conspiracy to artificially fix and suppress their wages. This duty arose from the particular circumstances of the employment relationship and the defendants' superior knowledge of the scheme.

4. Defendants actively and intentionally concealed this material fact by holding off the book meetings, using sham data anonymization to create a facade of legality, and making false public statements about offering competitive wages.

5. Defendants suppressed the existence of their inter-company wage-coordination scheme, a material fact plaintiffs could not reasonably discover, and that would have changed their employment and bargaining decisions

6. This fraudulent concealment induced the plaintiffs to continue their employment with the defendant Processors under the false belief that their compensation was determined by legitimate market forces.

7. As a direct and proximate result of this concealment, Plaintiffs continued to provide their labor for artificially depressed compensation, thereby suffering actual economic damage in the form of lost wages and benefits.

**COUNT II: UNJUST ENRICHMENT (Against Defendant Employer Processors)**

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. The plaintiffs provided something of value to the defendants, their labor;

3. The defendants requested Plaintiffs' labor efforts;

4. The plaintiffs are entitled by law to fair compensation; and

5. Fair compensation is necessary to prevent the defendants from being unjustly enriched. APJI 11.18; *Matador Holdings, Inc. v. HoPo Realty Investments, L.L.C.*, 77 So. 3d 139 (Ala. 2011).

6. The plaintiffs provided a benefit to the defendant Processors in the form of their labor. The defendant Processors knowingly accepted and retained this benefit.

7. Processors retained the benefit of unlawfully reduced labor costs in this jurisdiction.

42

8. The retention of this benefit is unjust because it was obtained through "unconscionable conduct," namely the fraudulent, coercive, and long-running conspiracy to illegally suppress employee wages. *Jordan v. Mitchell*, 705 So. 2d 453 (Ala. Civ. App. 1997). The defendant Processors have been unjustly enriched by the value of the labor for which they systematically and illegally underpaid the plaintiffs.

### COUNT III: NEGLIGENCE (Against All Defendants)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. Defendants owed a duty of reasonable care to their employees and to the labor market to not engage in conduct that would unlawfully restrain trade and artificially suppress wages and cause damages to the plaintiffs and those similarly situated in this jurisdiction.

3. Defendants breached this duty by forming, implementing, monitoring, and concealing a conspiracy that systematically dismantled the competitive mechanisms for wage-setting in the poultry processing industry and caused damages to the plaintiffs and those similarly situated in this jurisdiction.

4. This breach was the direct and proximate cause of the plaintiffs' harm, as it resulted in their compensation being set at artificially depressed levels, causing significant economic damages.

### COUNT IV: WANTONNESS (Against All Defendants)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. Wantonness is conduct carried on with a reckless or conscious disregard of the rights or safety of others, with an awareness that harm will likely result. *APJI 9.00; Ala. Code § 6-11-20(b)(3).*

3. The defendants' participated in a multi-decade, systematic, and fraudulently concealed conspiracy to suppress the wages of a vulnerable workforce for the purpose of maximizing corporate profit with a conscious and reckless disregard for the rights of the plaintiffs.

43

DOCUMENT 2

4.  Defendants knew or should have known that their actions in eliminating labor market competition would probably and likely result in substantial economic harm to their employees and cause damages to the plaintiffs and those similarly situated in this jurisdiction. Their decision to proceed with this scheme for over twenty years constitutes wantonness and directly and proximately caused damages to plaintiffs.

### COUNT V: CIVIL CONSPIRACY (Against All Defendants)

1.  Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2.  A civil conspiracy is a combination of two or more persons to do something unlawful or to do something lawful by unlawful means. The underlying torts for this conspiracy include, but are not limited to, fraud, fraudulent concealment, and wantonness, which are sufficient to support a conspiracy claim under Alabama law.

3.  As detailed in the Factual Allegations, all defendants agreed and worked together to achieve a common, unlawful end: the suppression of employee compensation, to the detriment of the plaintiffs causing damages to the plaintiffs and those similarly situated in this jurisdiction.

4.  Defendants achieved this end through unlawful means, including secret meetings, fraudulent information exchanges, and other tortious acts as outlined herein. This concerted action directly and proximately caused the plaintiffs' economic and emotional harm.

### COUNT VI: OUTRAGE (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS) (Against All Defendants)

1.  Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2.  Defendants' conduct, a multi-decade, secret scheme to exploit a captive and vulnerable workforce for corporate profit by illegally suppressing their wage, is so outrageous in character and so extreme in degree that it goes beyond all bounds of decency, and it is regarded as atrocious and utterly intolerable in a civilized society.

44

3. This intentional and extreme conduct caused the plaintiffs severe emotional distress, including feelings of anxiety, hopelessness, and betrayal, resulting from the knowledge that their hard labor was systematically undervalued through an illegal and fraudulent scheme.

4. The defendants intended to cause, or knew their conduct was likely to cause, emotional distress of Plaintiffs and those similarly situated in this jurisdiction;

5. The defendants' conduct was extreme and outrageous;

6. The defendants' conduct caused emotional distress; and

7. The distress to Plaintiffs was severe.

## COUNT VII: INTENTIONAL INTERFERENCE WITH A BUSINESS RELATIONSHIP (Non-employer co-conspirators)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

2. Each Plaintiff had a protectible business relationship with their respective employer (one of the defendant Processors).

3. Employment relationships existed between each Plaintiff and their direct employer.

4. The co-conspirator defendants intentionally interfered with these relationships by engaging in a conspiracy to fix wages at artificially low levels, thereby altering a fundamental term of the employment relationship to the plaintiffs' detriment.

5. The co-conspirator defendants knew or should have known that their actions would cause damages to workers in this jurisdiction, including the plaintiffs and those similarly situated.

6. This intentional interference directly and proximately damaged the plaintiffs by causing them to receive suppressed compensation.

## COUNT VIII: VICARIOUS LIABILITY & RATIFICATION (Against Defendant Processors)

1. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

45

2. Pursuant to APJI 5.00, 5.08, 9.03, and Ala. Code § 6-11-27, the Defendant Processors are vicariously liable for the wrongful acts of their agents and employees, including the individual HR and Plant Manager Defendants.

3. These employees acted within the line and scope of their employment when they participated in the conspiracy, as their acts of exchanging wage data were part of their job responsibilities and were calculated to benefit their employers by lowering labor costs.

4. The defendant Processors, with full knowledge of the facts and circumstances of this conduct, ratified the wrongful acts of their employees by accepting the benefits of suppressed labor costs and continuing the conspiracy for over two decades which directly and proximately caused damages to the plaintiffs.

**PRAYER FOR RELIEF**

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs respectfully request that this Honorable Court enter a judgment in their favor and against the defendants, jointly and severally, and award the following relief:

1. A judgment in favor of the plaintiffs and against the defendants, not to exceed $74,999.00 per Plaintiff;

2. An award of compensatory damages in an amount to be determined at trial for lost wages, salaries, and benefits;

3. An award of damages for mental anguish and emotional distress in an amount to be determined at trial;

4. An award of punitive damages in an amount sufficient to punish the defendants for their fraudulent, wanton, and malicious conduct and to deter similar conduct in the future;

5. An award of pre-judgment and post-judgment interest as allowed by law;

6. An award for the costs of this action and reasonable attorneys' fees; and

7. Such other and further relief as the Court deems just, equitable, and proper.

DOCUMENT 2

/s/ *Christina D. Crow*
One of the attorneys for Plaintiffs


OF COUNSEL:
Christina D. Crow (CRO064)
C. Elizabeth Littell (LIT028)
Kijana Mitchell (MIT080)
JINKS CROW, PC
219 N. Prairie Street
Union Springs, AL 36089
334-738-4225
christy.crow@jinkscrow.com
lisa.littell@jinkscrow.com
kijana.mitchell@jinkscrow.com

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

/s/ *Christina D. Crow*
OF COUNSEL


**Service on Defendants as follows:**

Agri Stats, Inc.
c/o Brenda Sievers
6510 Mutual Dr
Fort Wayne, IN 46825

Perdue Farms, Inc.
c/o CT Corporation System
2 N Jackson Street, Suite 605
Montgomery, AL 36104

DOCUMENT 2

Perdue Foods LLC
c/o CT Corporation System
2 N Jackson Street, Suite 605
Montgomery, AL 36104

Tyson Foods, Inc.
c/o United Agent Group Inc.
1521 Concord Pike, Suite 201
Wilmington, DE 19803

Pilgrim's Pride Corporation
c/o CT Corporation System
2 North Jackson St, Suite 605
Montgomery, AL 36104

Wayne-Sanderson Farms LLC
c/o CT Corporation System
2 N Jackson Street, Suite 605
Montgomery, AL 36104

Wayne Farms, LLC
c/o CT Corporation System
2 N Jackson Street, Suite 605
Montgomery, AL 36104

Cargill Meat Solutions, Inc.
c/o United Agent Group Inc.
4000 Eagle Point Corporate Dr
Birmingham, AL 35242

Continental Grain Company
c/o CT Corporation System
2 N Jackson Street, Suite 605
Montgomery, AL 36104

Koch Foods, Inc.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

Koch Foods of Alabama, LLC
c/o CT Corporation System
2 N Jackson Street, Suite 605
Montgomery, AL 36104

Peco Foods Inc.
c/o Patrick Noland
1101 Greensboro Ave
Tuscaloosa, AL 35401

Foster Poultry Farms, LLC
c/o CT Corporation System
2 North Jackson St., Suite 605
Montgomery, AL 36104

| State of Alabama<br>Unified Judicial System<br>Form C-34  Rev. 4/2024 | SUMMONS<br>- CIVIL - | Court Case Number<br>09-CV-2026-900001.00 |
|---|---|---|

**IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA COUNTY, ALABAMA**
**JAMES HERBERT AYERS ET AL V. AGRI STATS, INC. ET AL**

**NOTICE TO:** WAYNE-SANDERSON FARMS LLC, C/O CT CORPORATION SYSTEM 2 N JACKSON STREET, SUITE 605, MONTGOMERY, AL 36104

*(Name and Address of Defendant)*

THE COMPLAINT OR OTHER DOCUMENT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT, AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT OR OTHER DOCUMENT, WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE PLAINTIFF(S) OR ATTORNEY(S) OF THE PLAINTIFF(S),
Carolyn Elizabeth Littell

*[Name(s) of Attorney(s)]*

WHOSE ADDRESS(ES) IS/ARE: PO Box 350, Union Springs, AL 36089

*[Address(es) of Plaintiff(s) or Attorney(s)]*

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT OR OTHER DOCUMENT WERE SERVED ON YOU OR A JUDGMENT BY DEFAULT MAY BE RENDERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT OR OTHER DOCUMENT.

**TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY THE ALABAMA RULES OF CIVIL PROCEDURE TO SERVE PROCESS:**

☐ You are hereby commanded to serve this Summons and a copy of the Complaint or other document in this action upon the above-named Defendant.

☑ Service by certified mail of this Summons is initiated upon the written request below of     JAMES HERBERT AYERS
pursuant to the Alabama Rules of the Civil Procedure.                                                                    *[Name(s)]*

| 01/07/2026 | /s/ RASHAWN HARRIS | By: |
|---|---|---|
| *(Date)* | *(Signature of Clerk)* | *(Name)* |

☑ Certified Mail is hereby requested.    /s/ Carolyn Elizabeth Littell
*(Plaintiff's/Attorney's Signature)*

**RETURN ON SERVICE**

*Certified Mail*

☐ Return receipt of certified mail received in this office on _____

*(Date)*

*Personal/Authorized*

☐ I certify that I personally delivered a copy of this Summons and the Complaint or other document to
_____ in _____ County, Alabama on _____
*(First and Last Name of Person Served)*     *(Name of County)*                          *(Date)*

Document left:

☐ with above-named Defendant;

☐ with an individual authorized to receive service of process pursuant to Rule 4(c), Alabama Rules of Civil Procedure;

☐ at the above-named Defendant's dwelling house or place or usual place of abode with some person of suitable age and discretion then residing therein.

*Return of Non-Service*

☐ I certify that service of process of this Summons and the Complaint or other document was returned- Not Found

☐ I certify that service of process of this Summons and the Complaint or other document was refused by
_____ in _____ County, Alabama on _____ who is:
*(First and Last Name of Person Served)*     *(Name of County)*                          *(Date)*

☐ the above-named Defendant;

☐ an individual authorized to receive service of process pursuant to Rule 4(c), Alabama Rules of Civil Procedure;

☐ As a designated process server pursuant to Rule 4(i)(1)(B), Alabama Rules of Civil Procedure, I certify that I am at least 19 years of age, I am not a party to this proceeding, and I am not related within the third degree by blood or marriage to the party seeking service of process.

| *(Type of Process Server)* | *(Server's Signature)* | *(Address of Server)* |
|---|---|---|
| *(Badge or Precinct Number of Sheriff or Constable)* | *(Server's Printed Name)* | |
| *(Badge or Precinct Number of Sheriff or Constable)* | *(Telephone Number of Designated Process Server)* | **Service Return Copy** |